# EXHIBIT A

**BALABAN & SPIELBERGER, LLP**
11999 San Vicente Blvd., Suite 345
Los Angeles, CA 90049
Tel: (424) 832-7677
Fax: (424) 832-7702
Daniel K. Balaban, State Bar No. 243652
  *daniel@dbaslaw.com*
Andrew J. Spielberger, State Bar No. 120231
  *andrew@dbaslaw.com*
Kahren Harutyunyan, State Bar No. 298449
  *kahren@dbsalaw.com*

Attorneys for Plaintiffs, ESTHER GOMES; CAMERON
K. GOMES; CARSON S. GOMES; The Estate of Scott
Kelley Gomes, administered by Esther Gomes

Electronically FILED by
Superior Court of California,
County of Los Angeles
11/14/2024 4:11 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By D. Gallegos, Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| ESTHER GOMES; CAMERON K. GOMES; CARSON S. GOMES; The Estate of Scott Kelley Gomes, administered by Esther Gomes, <br><br> Plaintiff, <br><br> v. <br><br> 3M COMPANY; E. I. DUPONT DE NEMOURS & CO.; THE CHEMOURS COMPANY; ARCHROMA U.S., INC.; ARKEMA INC.; AGC CHEMICALS AMERICAS, INC.; DAIKIN AMERICA, INC.; DYNAX CORPORATION; JOHNSON CONTROLS, INC.; TYCO FIRE PRODUCTS, L.P.; CHEMGUARD, INC.; NATIONAL FOAM, INC.; CARRIER GLOBAL CORPORATION; KIDDE-FENWAL, LLC; PERIMETER SOLUTIONS LP; FIRE SERVICE PLUS, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; AMEREX CORPORATION; MINE SAFETY APPLIANCE COMPANY, LLC; GLOBE MANUFACTURING COMPANY LLC; LION GROUP, INC.; W. L. GORE & ASSOCIATES, INC.; TENCATE PROTECTIVE FABRICS USA D/B/A SOUTHERN MILLS INC.; PBI | Case No. 24NNCV05881 <br><br> **COMPLAINT FOR DAMAGES** <br><br> 1. **STRICT LIABILITY - DESIGN DEFECT** <br> 2. **STRICT LIABILITY – FAILURE TO WARN** <br> 3. **NEGLIGENCE** <br> 4. **WRONGFUL DEATH** <br> 5. **SURVIVAL ACTION** <br> 6. **LOSS OF CONSORTIUM** <br><br> **DEMAND FOR JURY TRIAL** |

PERFORMANCE PRODUCTS, INC.;
HONEYWELL SAFETY PRODUCTS USA,
INC.; STEDFAST USA; L.N. CURTIS AND
SONS; ALLSTAR FIRE EQUIPMENT CO.;
MALLORY SAFETY AND SUPPLY LLC;
MUNICIPAL EMERGENCY SERVICES
INC., and DOES 1-100,

Defendants.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

## COMPLAINT

Plaintiffs ESTHER GOMES, CAMERON K. GOMES, CARSON S. GOMES, and The Estate of Scott Kelley Gomes, administered by Esther Gomes by and through their attorneys of record, allege as follows:

## INTRODUCTION

1.      Plaintiffs are ESTHER GOMES, the widow of the former Santa Maria CalFire Captain, Scott Kelley Gomes (hereinafter "MRS. GOMES"); Scott Kelley Gomes's two sons, CAMERON K. GOMES and CARSON S. GOMES; and The Estate of Scott Kelley Gomes, administered by Esther Gomes, (the "GOMES ESTATE"); all of Scott Kelley Gomes's survivors in interest. All Plaintiffs will hereinafter collectively be referred to as "PLAINTIFFS".

2.      Scott Kelley Gomes was in fire service for over 30 years in various ranks and positions, with his home with CalFire for 25 years. Captain Gomes worked his way up through the ranks of EMT, firefighter, engineer, fire captain and trainer with CalFire. Many of his students credit their lives to what Captain Gomes taught them and instilled in them. Captain Gomes advised his students, sons, and the youth, to "[n]ever stop chasing your dreams, because one day you might cut them." He never stopped giving of himself, still mentoring and guiding his students even after retirement. Captain Gomes enjoyed giving back to the community he grew up in and served.

3.      Throughout his decades of training, service, continued certification and re-certification and heroic actions, Scott Kelley Gomes routinely wore turnouts and used Class B firefighting foam. He was unaware that the turnouts he wore, and the Class B foam he used contained PFAS or PFAS-containing materials. (The deceased Scott Kelley Gomes will hereinafter be referred to as "MR. GOMES" or "CAPTAIN GOMES")

4.      PLAINTIFFS bring this action for monetary damages and appropriate equitable and injunctive relief for harm resulting from exposure to per- and polyfluoroalkyl substances ("PFAS") that marketed, sold, supplied, distributed and/or contained in products were designed, manufactured, marketed, sold, supplied and/or distributed by each of the Defendants, individually or through their predecessors or subsidiaries.

5.      PFAS are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured products to, *inter alia*, resist and repel oil, stains, heat and water. PFAS include "long-chain" PFAS made up of seven or more carbon atoms ("long-chain PFAS") as well as "short-chain" PFAS made up of six or fewer carbon atoms ("short-chain PFAS").

6.      PFAS are known as "forever chemicals" because they are immune to degradation, bio-accumulate in individual organisms and humans, and increase in concentration up the food chain. PFAS exposure to humans can occur through inhalation, ingestion and dermal contact.[1]

7.      PFAS have been associated with multiple and serious adverse health effects in humans including cancer, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension. PFAS have also been found to concentrate in human blood, bones and organs and, most recently, to reduce the effectiveness of vaccines, a significant concern in light of COVID-19.

8.      Unbeknownst to the brave firefighters throughout the United States, including in California, the Defendants have designed, manufactured, marketed, sold, supplied and/or distributed, or used PFAS and PFAS-containing materials in protective clothing specifically designed for firefighters ("turnouts") and in Class B firefighting foams ("Class B foam").[2]

9.      For decades, Defendants were aware of the toxic nature of PFAS and the harmful impact these substances have on human health. Yet, Defendants manufactured, designed, marketed, sold, supplied, or distributed PFAS and PFAS chemical feedstock,[3] as well PFAS-containing turnouts

---

[1] Suzanne E. Fenton, MS, PhD, *PFAS Collection*, Environmental Health Perspectives (February 22, 2019), https://ehp.niehs.nih.gov/curated-collections/pfas.

[2] Class B foams are synthetic "soap-like" foams that spread rapidly across the surface of a fuel or chemical fire to stop the formation of flammable vapors. The most common Class B foam is aqueous film-forming foam (or "AFFF").

[3] Chemical feedstock refers to a chemical used to support a large-scale chemical reaction. The PFAS chemicals utilized to manufacture products containing PFAS are generally referred to herein as "chemical feedstock."

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1    and Class B foam, to firefighting training facilities and fire departments nationally, including in

2    California and in Santa Clara County. Defendants did so, moreover, without ever informing

3    firefighters or the public that their turnouts and Class B foams contained PFAS, and without warning

4    firefighters or the public of the substantial and serious health injuries that can result from exposure

5    to PFAS or PFAS-containing materials.

6         10.    CAPTAIN GOMES wore turnouts and used Class B foam in the usual and normal

7    course of performing his firefighting duties and training for decades and was repeatedly exposed to

8    PFAS in his workplace through multiple departments. He did did not know and, in the exercise of

9    reasonable diligence, could not have known that these products contained PFAS or PFAS-containing

10   materials. CAPTAIN GOMES also did not know that PFAS penetrated into his body and his blood.

11        11.    Meanwhile, at all relevant times and continuing to the present, Defendants have

12   represented that their turnouts and Class B foams are safe.

13        12.    MR. GOMES used the turnouts and Class B foam as they were intended and in a

14   foreseeable manner which exposed him to PFAS in the course of his firefighting service. This

15   repeated and extensive exposure to PFAS resulted in MR. GOMES being diagnosed with cancer

16   around August 15, 2022, and ultimately dying from cancer on November 17, 2022.

17        13.    Defendants knowingly and willfully designed, manufactured, marketed, sold, and

18   distributed chemicals and/or products containing PFAS for use within the State of California, and

19   within Los Angeles, Santa Barbara, San Luis Obispo and other Counties, when they knew or

20   reasonably should have known that firefighters throughout California, including in the Counties of

21   Los Angeles, Santa Barbara, San Luis Obispo, including CAPTAIN GOMES would repeatedly

22   inhale, ingest and/or have dermal contact with these harmful compounds during firefighting training

23   exercises and in firefighting emergencies, and that such exposure would threaten the health and

24   welfare of firefighters, including the health and welfare of CAPTAIN GOMES, when exposed to

25   these dangerous and hazardous chemicals.

26        14.    PLAINTIFFS bring this action against Defendants and seek damages, together with

27   any appropriate injunctive or other equitable relief.

28   ///

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

4
COMPLAINT

**PARTIES TO THE ACTION**

**PLAINTIFFS**

**A.    ESTHER GOMES; CAMERON K. GOMES and CARSON S. GOMES; The Estate of Scott Kelley Gomes, administered by Esther Gomes.**

15.    Plaintiff MRS. GOMES is the widow of CAPTAIN GOMES and the administrator of the GOMES ESTATE. MR. and MRS. GOMES were legally married for 30 years, including at the time of MR. GOMES's death. CAMERON K. GOMES and CARSON S. GOMES are MR. and MRS. GOMES's sons, and together with MRS. GOMES, they are the only wrongful death heir of the deceased CAPTAIN GOMES.

16.    ESTHER GOMES; CAMERON K. GOMES and CARSON S. GOMES are also the only successors in interest to the GOMES ESTATE, (hereinafter as "SUCCESSORS").

**DEFENDANTS**

17.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant 3M Company (a/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California. 3M has its principal place of business in St. Paul, Minnesota. 3M developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California.

18.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant E. I. du Pont de Nemours & Co. ("DuPont") is a Delaware corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California. DuPont has its principal place of business in Wilmington, Delaware. DuPont developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties.

19.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant The

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

Chemours Company, L.L.C. ("Chemours") is a Delaware corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California. Chemours has its principal place of business in Wilmington, Delaware. Chemours developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California.

20.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Archroma U.S., Inc. ("Archroma") is a North Carolina corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties. Archroma has its principal place of business in Charlotte, North Carolina. Archroma developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California.

21.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Arkema Inc. ("Arkema") is a Pennsylvania corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California. Arkema has its principal place of business in King of Prussia, Pennsylvania. Arkema developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California.

22.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California. AGC has its principal place of business in Exton, Pennsylvania. AGC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1  in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in

2  California.

3       23.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Daikin

4  America, Inc. ("Daikin America") is a Delaware corporation that does business throughout the United

5  States, including conducting business in California, and within Los Angeles, Santa Barbara, San Luis

6  Obispo and other Counties in California. Daikin America has its principal place of business in

7  Orangeburg, New York. Daikin America developed, manufactured, marketed, distributed, released,

8  sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B

9  foams, including in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other

10  Counties in California.

11       24.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Dynax

12  Corporation ("Dynax") is a New York corporation that does business throughout the United States,

13  including conducting business in California, and within Los Angeles, Santa Barbara, San Luis Obispo

14  and other Counties in California. Dynax has its principal place of business in Pound Ridge, New

15  York. Dynax developed, manufactured, marketed, distributed, released, sold, and/or used PFAS,

16  PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in

17  California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California.

18       25.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Johnson

19  Controls, Inc. ("Johnson Controls") is a Delaware corporation that does business throughout the

20  United States, including conducting business in California, and within Los Angeles, Santa Barbara,

21  San Luis Obispo and other Counties in California. Johnson Controls has its principal place of business

22  in Milwaukee, Wisconsin. Johnson Controls is the parent of Defendants Tyco Fire Products, LP and

23  Chemguard, Inc. Johnson Controls developed, manufactured, marketed, distributed, released, sold,

24  and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams,

25  including in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties

26  in California.

27       26.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Tyco

28  Fire Products, L.P. ("Tyco") is a Delaware corporation that does business throughout the United

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

7

COMPLAINT

1  States, including conducting business in California, and within Los Angeles, Santa Barbara, San Luis

2  Obispo and other Counties in California. Tyco has its principal place of business in Exeter, New

3  Hampshire. Tyco developed, manufactured, marketed, distributed, released, sold, and/or used PFAS,

4  PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in

5  California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California.

6      27.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant

7  Chemguard, Inc. ("Chemguard") is a Wisconsin corporation that does business throughout the United

8  States, including conducting business in California, and within Los Angeles, Santa Barbara, San Luis

9  Obispo and other Counties in California. Chemguard has its principal place of business in Marinette,

10 Wisconsin. Chemguard developed, manufactured, marketed, distributed, released, sold, and/or used

11 PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including

12 in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in

13 California.

14      28.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant National

15 Foam, Inc., ("National Foam") is a Pennsylvania corporation that does business throughout the United

16 States, including conducting business in California, and within Los Angeles, Santa Barbara, San Luis

17 Obispo and other Counties in California. National Foam has its principal place of business in West

18 Chester, Pennsylvania. National Foam developed, manufactured, marketed, distributed, released,

19 sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B

20 foams, including in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other

21 Counties in California.

22      29.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Carrier

23 Global Corporation ("Carrier") is a Delaware corporation that does business throughout the United

24 States, including conducting business in California, and within Los Angeles, Santa Barbara, San Luis

25 Obispo and other Counties in California. Carrier has its principal place of business in Palm Beach

26 Gardens, Florida. Carrier is the parent of Defendant Kidde-Fenwal, Inc. Carrier developed,

27 manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products

28 containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles,

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

8

COMPLAINT

1  Santa Barbara, San Luis Obispo and other Counties in California.

2      30.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Kidde-

3  Fenwal, Inc. ("Kidde-Fenwal") is a Delaware corporation that does business throughout the United

4  States, including conducting business in California, and within Los Angeles, Santa Barbara, San Luis

5  Obispo and other Counties in California. Kidde-Fenwal has its principal place of business in Ashland,

6  Massachusetts. Kidde-Fenwal developed, manufactured, marketed, distributed, released, sold, and/or

7  used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams,

8  including in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties

9  in California.

10      31.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant

11  Perimeter Solutions LP, ("Perimeter Solutions") is a Delaware corporation that does business

12  throughout the United States, including conducting business in California, and within Los Angeles,

13  Santa Barbara, San Luis Obispo and other Counties in California. Perimeter Solutions has a principal

14  place of business in Rancho Cucamonga, California. Perimeter developed, manufactured, marketed,

15  distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in

16  turnouts and/or Class B foams, including in California, and within Los Angeles, Santa Barbara, San

17  Luis Obispo and other Counties in California.

18      32.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Fire

19  Service Plus, Inc. ("Fire Service Plus") is a Georgia corporation that does business throughout the

20  United States, including conducting business in California, and within Los Angeles, Santa Barbara,

21  San Luis Obispo and other Counties in California. Fire Service Plus has its principal place of business

22  in Simi Valley, California. Fire Service Plus developed, manufactured, marketed, distributed,

23  released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or

24  Class B foams, including in California, and within Los Angeles, Santa Barbara, San Luis Obispo and

25  other Counties in California.

26      33.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Buckeye

27  Fire Equipment Company ("Buckeye") is a North Carolina corporation that does business throughout

28  the United States, including conducting business in California, and within Los Angeles, Santa

COMPLAINT

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1  Barbara, San Luis Obispo and other Counties in California. Buckeye has its principal place of

2  business in Kings Mountain, North Carolina. Buckeye developed, manufactured, marketed,

3  distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in

4  turnouts and/or Class B foams, including in California, and within Los Angeles, Santa Barbara, San

5  Luis Obispo and other Counties in California.

6      34.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Amerex

7  Corporation, also known as Alabama Amerex Corporation, ("Amerex") is an Alabama corporation

8  that does business throughout the United States, including conducting business in California, and

9  within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California. Amerex has

10  its principal place of business in Trussville, Alabama. Amerex developed, manufactured, marketed,

11  distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in

12  turnouts and/or Class B foams, including in California, and within Los Angeles, Santa Barbara, San

13  Luis Obispo and other Counties in California.

14      35.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Mine

15  Safety Appliance Company, LLC ("MSA/Globe") is a Pennsylvania corporation that does business

16  throughout the United States, including conducting business in California, and within Los Angeles,

17  Santa Barbara, San Luis Obispo and other Counties in California. MSA has its principal place of

18  business in Cranberry Township, Pennsylvania. MSA acquired Globe Holding Company, LLC and

19  its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe

20  name. MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS

21  materials, and products containing PFAS in turnouts and/or Class B foams, including in California,

22  and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California.

23      36.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Globe

24  Manufacturing Company LLC ("Globe") is a New Hampshire corporation that does business

25  throughout the United States, including conducting business in California, and within Los Angeles,

26  Santa Barbara, San Luis Obispo and other Counties in California. Globe has its principal place of

27  business in Pittsfield, New Hampshire. Globe developed, manufactured, marketed, distributed,

28  released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or

1  Class B foams, including in California, and within Los Angeles, Santa Barbara, San Luis Obispo and

2  other Counties in California. Defendant Mine Safety Appliance Company acquired Globe Holding

3  Company, LLC and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do

4  business under the Globe name.

5      37.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant Lion

6  Group, Inc., ("Lion") is an Ohio corporation that does business throughout the United States,

7  including conducting business in California, and within Los Angeles, Santa Barbara, San Luis Obispo

8  and other Counties in California. Lion has its principal place of business in Dayton, Ohio. Lion

9  developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials,

10  and products containing PFAS in turnouts and/or Class B foams, including in California, and within

11  Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California.

12      38.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant W. L.

13  Gore & Associates, Inc., ("Gore") is a Delaware corporation that does business throughout the United

14  States, including conducting business in California, and within Los Angeles, Santa Barbara, San Luis

15  Obispo and other Counties in California. Gore has its principal place of business in Newark,

16  Delaware. Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS,

17  PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in

18  California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California.

19      39.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant TenCate

20  Protective Fabrics USA d/b/a Southern Mills, Inc. ("Tencate") is a Georgia corporation that does

21  business throughout the United States, including conducting business in California, and within Los

22  Angeles, Santa Barbara, San Luis Obispo and other Counties in California. Tencate has its principal

23  place of business in Senoia, Georgia. Tencate developed, manufactured, marketed, distributed,

24  released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or

25  Class B foams, including in California, and within Los Angeles, Santa Barbara, San Luis Obispo and

26  other Counties in California.

27      40.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant PBI

28  Performance Products, Inc., ("PBI") is a Delaware corporation that does business throughout the

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

11

COMPLAINT

1  United States, including conducting business in California, and within Los Angeles, Santa Barbara,

2  San Luis Obispo and other Counties in California. PBI has its principal place of business in Charlotte,

3  North Carolina. PBI developed, manufactured, marketed, distributed, released, sold, and/or used

4  PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including

5  in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in

6  California.

7      41.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant

8  Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation that does business

9  throughout the United States, including conducting business in California, and within Los Angeles,

10 Santa Barbara, San Luis Obispo and other Counties in California. Honeywell has its principal place

11 of business in Charlotte, North Carolina. Honeywell developed, manufactured, marketed, distributed,

12 released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or

13 Class B foams, including in California, and within Los Angeles, Santa Barbara, San Luis Obispo and

14 other Counties in California.

15     42.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant StedFast

16 USA ("StedFast") is a Delaware corporation that does business throughout the United States,

17 including conducting business in California, and within Los Angeles, Santa Barbara, San Luis Obispo

18 and other Counties in California. StedFast has its principal place of business in Piney Flats,

19 Tennessee. StedFast developed, manufactured, marketed, distributed, released, sold, and/or used

20 PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including

21 in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in

22 California.

23     43.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant L.N.

24 Curtis and Sons ("LN Curtis") is a California corporation that does business in California, and within

25 Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California. LN Curtis has its

26 principal place of business in Walnut Creek, California. LN Curtis developed, manufactured,

27 marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing

28 PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Santa

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

12

COMPLAINT

Barbara, San Luis Obispo and other Counties in California.

44.    PLAINTIFFS are informed and believe, and thereupon allege that Defendant AllStar Fire Equipment Co. ("AllStar") is a California corporation that does business in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California. AllStar has its principal place of business in Arcadia, California. AllStar developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California.

45.    PLAINTIFFS are informed and believe, and thereupon allege that Mallory Safety and Supply LLC ("Mallory") is a California corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California. Mallory has its principal place of business in Longview, Washington. Mallory developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California.

46.    PLAINTIFFS are informed and believe, and thereupon allege that Municipal Emergency Services, Inc. ("MES") is a Nevada corporation that does business throughout the United States, including conducting business in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California. MES has its principal place of business in Santa Fe Springs, California. MES developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California, and within Los Angeles, Santa Barbara, San Luis Obispo and other Counties in California.

47.    The true names and/or capacities, whether individual, corporate, associate or otherwise of defendants DOES 1 - 100, inclusive, and each of them, are unknown to PLAINTIFFS, who therefore sue said defendants by such fictitious names. PLAINTIFFS are informed and believe, and thereupon allege, that each defendant fictitiously named herein as a DOE was legally responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

13
COMPLAINT

1 | and proximately thereby caused the injuries, emotional pain and suffering, as well as economic

2 | damages to PLAINTIFFS as hereinafter alleged. PLAINTIFFS will ask for leave of court to amend

3 | the complaint to insert the true names and/or capacities of such fictitiously named defendants when

4 | the same have been ascertained.

5 |      48.    PLAINTIFFS are currently unaware of the true names and capacities of Defendants

6 | named herein as DOES 1-100, inclusive, and PLAINTIFFS therefore sue those Defendants by

7 | fictitious names pursuant to California Code of Civil Procedure § 474. PLAINTIFFS will amend this

8 | complaint to state the true names and capacities of those Defendants sued herein as DOES when

9 | ascertained. PLAINTIFFS allege that each fictitiously named Defendant is in some manner

10 | responsible for the acts alleged herein and that they proximately caused the injuries to PLAINTIFFS

11 | as alleged herein.

12 |      49.    PLAINTIFFS are informed and believe, and thereupon allege, that at all times

13 | mentioned herein, DEFENDANTS, and each of them, including DOES 1 - 100, were the agents,

14 | servants, employees and/or joint venturers of their co-defendants and were, as such, acting within the

15 | course, scope and authority of said agency, employment and/or venture and that each and every

16 | DEFENDANTS, as aforesaid, when acting as a principal, was negligent in the selection and hiring of

17 | each and every other DEFENDANTS as an agent, employee and/or joint venturers were involved in

18 | the design, development, manufacture, testing, packaging, promotion, marketing, advertising,

19 | distribution, labeling, and/or sale of PFAS, PFAS materials, and products containing PFAS in the

20 | turnouts and/or Class B foams that firefighters, including CAPTAIN GOMES, used, as alleged

21 | herein.

22 |      50.    PLAINTIFFS allege that each named Defendant is in some manner responsible for the

23 | acts alleged herein and that they proximately caused the injuries to PLAINTIFFS, as alleged herein.

24 |      51.    PLAINTIFFS allege that each named Defendant derived substantial revenue from the

25 | PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams that

26 | Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised,

27 | distributed, labeled and/or sold within California, , and within Los Angeles, Santa Barbara, San Luis

28 | Obispo and other Counties in California, and that were used by firefighter within Los Angeles, Santa

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1  Barbara, San Luis Obispo and other Counties in California, including by CAPTAIN GOMES,

2  throughout his decorated career.

3      52.    Defendants expected or should have expected their acts to have consequences within

4  the State of California, and derived substantial revenue from interstate commerce.

5      53.    Defendants purposefully availed themselves of the privilege of conducting activities

6  within the State of California, thus invoking the benefits and protections of its laws.

7  **JURISDICTION AND VENUE**

8      54.    This Court has jurisdiction over this action under the California Code of Civil

9  Procedure § 410.10 and Article VI, § 10 of the California Constitution. The injuries and damages

10  alleged herein are in an amount within the jurisdiction of this Court.

11      55.    The California Superior Court has jurisdiction over all DEFENDANTS, including

12  DOES 1-100, because, based on information and belief, each is either a corporation and/or entity

13  and/or person organized under the laws of or having its principal place of business in the State of

14  California, a foreign corporation or association authorized to do business in California and registered

15  with the California Secretary of State, or that has sufficient minimum contacts in California, is a

16  citizen of California, or otherwise has intentionally availed itself of the California market so as to

17  render the exercise of jurisdiction over it by the California courts consistent with traditional notions

18  of fair play and substantial justice.

19      56.    Further, DEFENDANTS, including DOES 1-100, have each purposefully availed

20  themselves of the benefits and protections of the laws within the State of California. DEFENDANTS,

21  including DOES 1-100, conduct substantial business in California and have had sufficient contacts

22  with California such that the exercise of jurisdiction would be consistent with the traditional notions

23  of fair play and substantial justice.

24      57.    CAPTAIN GOMES exposure and PLAINTIFFS' injuries, resulting from the acts of

25  Defendants alleged herein, throughout Los Angeles, and/or Santa Barbara, San Luis Obispo and other

26  Counties, in California. Venue is also proper is this Court under California Code of Civil Procedure

27  § 395(a), because Defendant AllStar is a California corporation, with its principal place of business

28  in Arcadia, California, within the County of Los Angeles.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

## SUBSTANTIVE ALLEGATIONS

### A. CAPTAIN GOMES's Exposure to PFAS-Containing Products

58.     CAPTAIN GOMES has served the communities in Los Angeles, Santa Barbara, San Luis Obispo and other Counties as a firefighter, an engineer, and a captain. CAPTAIN GOMES worked in various fire stations, engines, and specialized companies.

59.     As a first responder to fire, hazardous materials incidents, and other emergency and medical calls, CAPTAIN GOMES risked his health and safety on daily basis. CAPTAIN GOMES not only saved lives and homes, he provided emergency services and medical care, performed rescue operations, and offered support to people in life-threatening circumstances. For his protection, CAPTAIN GOMES wore turnouts and received extensive and ongoing training in fire suppression (including the preparation and use of Class B foam), fire prevention, rescue, and emergency medical care action to protect and/or minimize the loss of life, property, and damage to the environment.

60.     For decades, Defendants, either individually or through their predecessors or subsidiaries, have manufactured, designed, sold, supplied, and distributed chemical feedstock and/or turnouts and Class B foam containing PFAS to firefighting training facilities and fire departments globally, including within the State of California and the Cities of Los Angeles, Santa Barbara, San Luis Obispo and neighboring communities in California.

61.     With over 5,000 individual chemicals, PFAS is a large and ever-growing category of human-made chemicals, consisting of a nearly indestructible chain of carbon and fluorine atoms that are widely used in products to, *inter alia*, resist and repel oil, heat and water, and have been found to have negative health effects. As detailed below, these toxic chemicals are present in firefighter turnouts and Class B foam.

### (1) PFAS-Containing Turnout Gear

62.     During firefighting training and when responding to fires and performing fire extinguishment, firefighters wear turnouts that are intended to provide a degree of thermal, chemical, and biological protection for a firefighter. Turnout gear components include a helmet, hood, jacket, pants, boots, and gloves. Each component is made of an outer layer, as well as several inner layers that include a moisture barrier and thermal liner which are meant to protect the firefighter from

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

16
COMPLAINT

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1  ambient heat.[4]

2      63.    PFAS chemicals are used in turnout gear to impart heat, water, and stain resistance to

3  the outer shell and moisture barrier of turnout gear.

4      64.    A June 2020 study of turnout gear by researchers at the University of Notre Dame

5  analyzed 30 new and used turnout jackets and pants originally marketed, distributed and sold in 2008,

6  2014, and 2017, by six turnout gear makers, including Defendants MSA/Globe, Lion and Honeywell

7  and found high levels of PFAS in turnout gear worn, used, or handled by firefighters, including

8  CAPTAIN GOMES.[5]

9      65.    When exposed to heat, PFAS chemicals in the turnouts off-gas, break down, and

10  degrade into highly mobile and toxic particles and dust,[6] exposing firefighters to PFAS chemicals,

11  particles and dust, including through skin contact/absorption, ingestion (e.g., hand-to-mouth contact)

12  and/or inhalation.[7] Further firefighter exposure to these highly mobile and toxic materials occurs

13  through normal workplace activities, because particles or dust from their turnouts spread to fire

14  vehicles and fire stations, as well as firefighters' cars and homes.[8]

15      66.    Such workplace exposure to PFAS or PFAS-containing materials has been found to

16  be toxic to humans. As far back as a July 31, 1980 internal memo, DuPont officials described

17  measures that were needed to prevent workplace exposure to PFOA, which they knew could permeate

18  all protective materials, and noted that PFOA's toxicity varied depending on the exposure pathway,

19  acknowledging that ingestion was "slightly toxic," dermal contact was "slightly to moderately toxic"

20  and inhalation was "highly toxic."[9] The memo concluded "continued exposure is not tolerable."[10]

21      67.    As alleged herein, CAPTAIN GOMES wore turnouts in the ordinary course of

22

23  ───────────────────

[4] *What Materials Go Into Making Turnout Gear?*, Globe MSA Safety Website, (last visited February 26, 2021),
https://globe.msasafety.com/selecting-your-gear/materials.

24  [5] Graham Peaslee et al., *Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter
Textiles*, Environmental Science & Technology Letters 2020, 7, 8, 594-599 (Ecotoxicology and Public Health) (June 23,

25  2020) (hereinafter, "the Notre Dame Turnout Study").

[6] A.S. Young et al., *Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust*, J. Expo. Sci.

26  Environ. Epidemiology (2021), https://doi.org/10.1038/s41370-021-00288-7.

[7] *Id.*

27  [8] *Id.*

[9] Robert Bilott, *Exposure* (2019), pg. 174.

28  [10] *Id.* at pg. 175.

17

COMPLAINT

1    performing his duties, as the turnouts were intended to be used and in a foreseeable manner, which

2    exposed him to significant levels of PFAS for years.

3         68.    MR. GOMES did not know, and in the exercise of reasonable diligence could not have

4    known, that the turnouts he wore or used in the course of performing his duties contained PFAS or

5    PFAS-containing materials, and similarly did not know and could not have known that he routinely

6    suffered exposure to PFAS or PFAS-containing materials in the turnouts they wore or used in

7    performing their duties. The turnout gear MR. GOMES wore or used did not contain labelling

8    information saying that the gear contained PFAS, and similarly did not warn MR. GOMES of the

9    health risks associated with exposure to PFAS.

10        **(2) PFAS-Containing Class B Foam**

11        69.    Class B foam is one of the primary tools used by firefighters for fire suppression and

12   is particularly effective for extinguishing fires involving oil and/or chemicals common at

13   transportation accidents, aircraft accidents, chemical spills, and Hazmat incidents. Class B foam is

14   also used in structural or other types of non-chemical fires when water cannot penetrate deeply

15   enough to ensure that unseen fire is extinguished. The most common Class B foam is aqueous film-

16   forming foam ("AFFF"). AFFF and other Class B foams contain PFAS.

17        70.    Class B foam concentrate is typically sold in five-gallon containers. To use Class B

18   foam, a Class B foam concentrate must first be mixed with water. To mix the foam concentrate and

19   water in an engine that is not pre-plumbed, an educator must be placed in the foam concentrate to

20   draw up the concentrate and mix it with water to create a thick, white, foamy substance.

21        71.    The process of mixing Class B foam, plumbing and preparing it, and cleaning the

22   equipment after foam use causes exposure to PFAS through skin contact, inhalation, or ingestion

23   (e.g., hand-to-mouth contact). The Class B foam containers used by MR. GOMES and the fire

24   departments to mix and prepare the Class B foam for use did not say that the foam contains PFAS,

25   and did not warn MR. GOMES of the serious health risks associated with exposure to PFAS.

26        72.    Class B foam is used in fire extinguishment in a manner typical of routine methods of

27   fire extinguishment—by being sprayed through a fire hose.

28        73.    The techniques used for "laying a blanket" of Class B foam in fire extinguishment

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

18

1    include: banking the foam off a wall or vertical surface to agitate the foam before it covers the fire;

2    or applying it to the ground surface where the fire is burning. In structure fires, it can also be necessary

3    to spray the ceilings, walls and floors. Reapplication of foam is often necessary because the foam

4    blanket will break down over time.

5        74.    These techniques are used routinely in firefighting training as well as in real-world

6    fire extinguishment, and result in firefighters being sprayed or entirely soaked with Class B foam,

7    walking in and through Class B foam (which can reach thigh- or even waist-high), or kneeling in

8    Class B foam during use – all as depicted in the exemplar photographs below. As a result, the

9    techniques cause exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-

10    mouth contact).

11        75.    As alleged herein, MR. GOMES used Class B foam in the ordinary course of

12    performing his duties as foam was intended to be used and in a foreseeable manner which exposed

13    him to significant levels of PFAS.

14        76.    MR. GOMES did not know, and in the exercise of reasonable diligence, could not

15    have known that the Class B foam they used in the course of performing their duties contained PFAS

16    or PFAS-containing materials, and similarly did not know and could not have known that they

17    routinely suffered exposure to PFAS or PFAS-containing materials in the Class B foam they used in

18    performing their duties.

19        77.    MR. GOMES's exposures to PFAS or PFAS-containing materials resulted in him

20    getting cancer, suffering through his cancer treatment and ultimately dying due to complications from

21    cancer.

22    **B. The Chemical Structure of PFAS Makes Them Harmful to Human Health**

23        78.    PFAS are known as "forever chemicals" because they are immune to degradation, bio-

24    accumulate in individual organisms and humans, and increase in concentration up the food chain.[11]

25    Indeed, scientists are unable to estimate an environmental half-life (i.e. the time it takes for 50% of

26

27

28

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

---

[11] *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, National Institute of Environmental Health Sciences (last visited February 26, 2021), https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm.

19

the chemical to disappear) for PFAS.[12] Additionally, some PFAS chemicals (known as "precursors")
degrade into different long-chain PFAS chemicals.[13]

79.    PFAS are nearly indestructible and are highly transportable.[14] PFAS exposure to
humans can occur through inhalation, ingestion, or dermal contact.[15]

80.    PFAS chemicals include "older" long-chain PFAS like PFOA, PFOS, and PFNA that
have seven or more carbon atoms, and "newer" short-chain PFAS, like PFBA, PFBS, PFHxA, and
PFHxS. The PFAS chemical industry has repeatedly asserted that short-chain PFAS are safer and
bio-degrade more easily than long-chain PFAS. However, short-chain PFAS are molecularly similar
to long-chain PFAS, and recent scientific research shows that short-chain PFAS are in fact extremely
persistent, highly mobile and transportable, almost impossible to remove from water, bio-accumulate
in humans and the environment, and show similar toxicity as long-chain PFAS.[16] For example, short-
chain PFBA (with only four carbon molecules) which was created by defendant 3M and reportedly
has a shorter half-life than other PFAS, recently has been found to accumulate in the lungs and, in
turn, increase the severity of COVID-19 in patients with elevated levels of PFBA,[17] among other
health concerns. Short-chain PFAS also have lower technical performance and may therefore be used
at higher quantities cancelling out any supposed benefits of lower bioaccumulation potential.[18]

81.    There is no safe, acceptable or "normal" level of PFAS in the human body. Further,

---

[12] *Id.*

[13] *Id.* at fn. 8; Monica Amarelo, *Study: Almost All Fluorine Detected in Fire Stations' Dust Is From Unknown "Forever Chemicals,"* Environmental Working Group (February 5, 2021), https://www.ewg.org/release/study-almost-all-fire-stations-dust-unknown-forever-chemicals.

[14] *Toxicological Profile for Perfluoroalkyls, see* Relevance to Public Health, Agency for Toxic Substances & Disease Registry, (last visited February 26, 2021), https://www.atsdr.cdc.gov/toxprofiles/tp.asp?id=1117&tid=237.

[15] *Id.* at Potential for Human Exposure, pg. 535.

[16] Cheryl Hogue, *Short-chain and long-chain PFAS show similar toxicity, US National Toxicology Program says*, Chemical and Engineering News, (August 24, 2019), https://cen.acs.org/environment/persistent-pollutants/Short-chain-long-chain-PFAS/97/i33; David Andrews, *FDA Studies: 'Short-Chain' PFAS Chemicals More Toxic Than Previously Thought*, Environmental Working Group (March 9, 2020), https://tinyurl.com/y3lbq7by; Stephan Brendel et al., *Short-chain Perfluoroalkyl Acids: Environmental Concerns and A Regulatory Strategy Under REACH*, Environmental Sciences Europe, Vol. 30, 1 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5834591/; Tom Neltner, *The Elephant in the Room: Potential Biopersistence of Short-Chain PFAS*, Environmental Defense Fund, (February 20, 2019), http://blogs.edf.org/health/2019/02/20/potential-biopersistence-short-chain-pfas/.

[17] *Exposure to Toxic Chemical Linked with Worse COVID-19 Outcomes*, The Harvard Gazette (Jan. 6, 2021), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-exposure-linked-with-worse-covid-19-outcomes/.

[18] Martin Scheringer et al., *Helsingor Statement on Poly- and Perfluorinated Alkyl Substances* (PFASs), Chemosphere (June 14, 2014), https://www.sciencedirect.com/science/article/pii/S004565351400678X.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1  the fact that PFOA, PFOS, PFHxS, PFHpA, and PFNA are often found together presents a substantial

2  risk to human health. Defendants' have continuously deflected from the reality that there are

3  thousands of PFAS in their products – including precursor PFAS which degrade into PFOA and

4  PFOS.[19]

5      82.    PFAS exposure affects nearly every system in the body.[20] It has been associated with

6  multiple and serious adverse health effects in humans including, but not limited to, cancer (in various

7  parts of the body), tumors, liver damage, immune system and endocrine disorders, thyroid disease,

8  ulcerative colitis, birth defects, decreased fertility, pregnancy-induced hypertension, accelerated

9  changes in gene expression, and increases in oxidative stress which can contribute to DNA changes,

10  tumor promotion, and other health conditions.[21] It has also been found to concentrate in human blood,

11  bones and organs, and to reduce the effectiveness of certain vaccines, a significant concern in light

12  of COVID-19.[22]

13  **C. Defendants Knowingly Designed, Manufactured, Developed, Marketed, Distributed,**

14      **Supplied and/or Sold Toxic PFAS and/or Products Containing PFAS**

15      83.    Defendants have each designed, manufactured, developed, marketed, distributed,

16  supplied, sold or otherwise used PFAS chemicals in products, including in PFAS-containing turnout

17  gear and Class B foam, throughout the United States and in California and within Los Angeles, Santa

18  Barbara, San Luis Obispo and other Counties in California.

19      84.    PFAS were first developed in the 1930s and 1940s. Soon after, 3M began

20  manufacturing a PFAS material called perfluorooctanoic acid ("PFOA"), selling it to other

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

---

[19] Technical Fact Sheet - Perfluorooctane Sulfonate (PFOS) and Perfluorooctanoic Acid (PFOA), United States Environmental Protection Agency, (Nov. 2017), https://www.epa.gov/sites/production/files/2017-12/documents/ffrrofactsheet_contaminants_pfos_pfoa_11-20-17_508_0.pdf.

[20] Kelly Lenox, *PFAS Senate Hearing, Birnbaum's Expert Scientific Testimony*, Environmental Factor, National Institute of Environmental Health Sciences (May 2019), https://factor.niehs.nih.gov/2019/5/feature/1-feature-pfas/index.htm.

[21] A. Koskela et al., *Perfluoroalkyl substances in human bone: concentrations in bones and effects on bone cell differentiation*, Scientific Reports, (July 28, 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5533791/pdf/41598_2017_Article_7359.pdf; *National Toxicology Program Technical Report on the Toxicology and Carcinogenesis Studies of Perfluorooctanoic Acid Administered in Feed to Sprague Dawley (Hsd: Sprague Dawley SD) Rats*, National Toxicology Program, (May 2020), https://ntp.niehs.nih.gov/ntp/htdocs/lt_rpts/tr598_508.pdf.

[22] *Id.* (Koskela study); Tasha Stolber, *PFAS Chemicals Harm the Immune System, Decrease Response to Vaccines, New EWG Review Finds*, Environmental Working Group (November 12, 2020), https://www.ewg.org/news-and-analysis/2020/11/pfas-chemicals-harm-immune-system-decrease-response-vaccines-new-ewg.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1   companies, including DuPont.

2          85.    By the 1950s, PFAS were widely used in large-scale manufacturing. Prior to this,

3   PFAS had never been detected in nor were present in human blood or bodies.

4          86.    In the 1960s, Class B foam containing PFAS entered the global market and became

5   the primary firefighting foam all over the world with 3M as one of the largest manufacturers.

6          87.    In the 1970s, Defendants National Foam and Tyco began to manufacture, market and

7   sell Class B foam containing PFAS, followed by Defendants Chemguard and Dynax in the 1990s,

8   and Defendant Buckeye in the 2000s.

9          88.    Founded in 1918, Defendant MSA/Globe began manufacturing, marketing and selling

10  turnout gear with DuPont's NOMEX® PFAS-containing flame resistant fabric in 1966. MSA/Globe

11  (under the Globe name) continues to manufacture, market and sell turnout gear using PFAS-

12  containing fabrics supplied by its partners, DuPont, Gore, Tencate, and PBI.[23]

13         89.    Defendant Lion began to manufacture, market and sell turnout gear in 1970. Since its

14  founding, and continuing through to the present, Lion makes, markets and sells turnout gear using

15  PFAS-containing fabrics, including Teflon® F-PPE-treated thermal lining material supplied by

16  Defendants DuPont's NOMEX® PFAS-containing flame/water/oil-resistant fabric, and moisture

17  barrier fabrics supplied by Defendant Gore.[24]

18         90.    Defendant Honeywell acquired Norcross Safety Products LLC in 2008, entering the

19  protective gear industry and becoming one of the leading manufacturers of turnouts. Honeywell

20  makes, markets and sells turnout gear using PFAS-containing fabrics, supplied by Defendants

21  DuPont, Gore, PBI and StedFast.

22         **D. Defendants Know Exposure to PFAS Causes Serious Health Impacts**

23         91.    Defendants, including specifically 3M and DuPont, have long known about the serious

24  and significant impacts to health caused by exposure to PFAS, having conducted study after study on

25

26  [23] *See Globe History*, Globe MSA Safety Website, (last visited February 26, 2021), https://globe.msasafety.com/history;
    *Turnout    Gear    Materials*,    Globe    MSA    Safety    Website,    (last    visited    February    26,    2021),
27  https://globe.msasafety.com/materials.
    [24] *See Our History*, Lion Website (last visited February 26, 2021), http://www.lionprotects.com/lion-history; *Firefighter
28  Turnouts*, Lion Website (last visited February 26, 2021), https://www.lionprotects.com/firefighter-turnout-gear#.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

the exposure and health effects of PFAS on animals, and in some cases, even on their own employees. The findings of these studies were discussed within the companies internally yet were never shared with their employees, nor were they made public or shared with any regulatory agencies. Among the findings:

a. A 1950 3M study showed that PFAS could build up in the blood of mice and that PFAS could bind to proteins in human blood suggesting that PFAS would not only remain, but also persist and accumulate in the body of the exposed individuals with each additional exposure.[25]

b. In 1961, a DuPont toxicologist warned that PFAS chemicals enlarge rat and rabbit livers.[26] A year later, these results were replicated in studies with dogs.[27]

c. In 1963, 3M's technical handbook classified PFAS as toxic and advised that "due care should be exercised in handling these materials."[28]

d. In 1970, a company that purchased 3M's firefighting foam had to abandon a test of the product because all the fish died.[29]

e. In the 1970s, DuPont discovered that there were high concentrations of PFOA in the blood samples of factory workers at DuPont's Washington Workssite.[30]

f. By the end of the 1970s, studies performed by, at least 3M, indicated that PFAS materials were resistant to environmental degradation and would persist in the environment.[31]

g. In 1981, 3M, which still supplied PFOA to DuPont and other corporations, found that ingestion of PFOA caused birth defects in rats. 3M reported this information to DuPont. DuPont then tested the children of pregnant employees in their Teflon division and found that of seven births, two children had eye defects. Defendants reassigned the female employees, but did not inform the EPA or make this information public.[32]

[25] Timeline - *For 50 Years, Polluters Knew PFAS Chemicals Were Dangerous But Hid Risks From Public*, Environmental Working Group, (2019), https://static.ewg.org/reports/2019/pfa-timeline/3M-DuPont-Timeline_sm.pdf; *see also*, https://www.ewg.org/pfastimeline/.
[26] *Id.*
[27] Nathaniel Rich, *The Lawyer Who Became DuPont's Worst Nightmare*, New York Times (June 6, 2016), https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html.
[28] *Id.* at fn. 28.
[29] *Id.*
[30] *Id.*
[31] *PFCS: Global Contaminants: PFCs Last Forever*, Environmental Working Group, (April 3, 2003), https://www.ewg.org/research/pfcs-global-contaminants/pfcs-last-forever.
[32] *Id.* at fn. 28.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

h.  In 1988, a company that purchased PFAS firefighting foam complained to 3M because the product was not biodegradable as 3M represented.[33] Subsequently, a 3M employee wrote an internal memo that "3M should stop perpetrating the myth that these fluorochemical surfactants are biodegradable, but the company continued to sell them."[34]

i.  By at least the end of the 1980s, research performed by Defendants, including specifically, Defendants 3M and DuPont, manufacturing and/or using PFAS materials indicated that at least one such PFAS material, PFOA, caused testicular tumors in a chronic cancer study in rats, resulting in at least Defendant DuPont classifying such PFAS material internally as a confirmed animal carcinogen and possible human carcinogen.[35]

j.  In the 1990s, Defendant DuPont knew that PFOA caused cancerous testicular, pancreatic and liver tumors in lab animals. One study also suggested that PFOA exposure could cause possible DNA damage.[36] Another study of workers found a link between PFOA exposure and prostate cancer.[37]

k.  In response to the alarming and detrimental health impact, DuPont began to develop an alternative to PFOA and in 1993, an internal memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and showed less bioaccumulation.[38] DuPont decided against using this potentially safer alternative, however, because products manufactured with PFOA were worth $1 billion in annual profit.[39]

l.  On June 30, 2000, 3M and DuPont met to share 3M's "pertinent data on PFOA". 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.[40]

92.  Additionally, approximately fifty years of studies by Defendants, including by 3M and DuPont, on human exposure to PFAS found unacceptable levels of toxicity and bio-accumulation, as

---

[33] *The Devil They Knew: PFAS Contamination and the Need for Corporate Accountability, Part II*, Transcript of Hearing Before the Subcommittee on Environment of the Committee on Oversight and Reform, House of Representatives (September 19, 2019), https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Transcript-20190910.pdf.

[34] *Id.*

[35] *Id.* at fn. 28.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] Internal DuPont Memorandum, DuPont Haskell Laboratory Visit (June 30, 2000), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf.

COMPLAINT

1  well as a link to increased incidence of liver damage, various cancers, and birth defects in humans

2  exposed to PFAS.[41] These studies also revealed that, once in the body, PFAS has a very long half-

3  life and that it takes years before even one-half of the chemicals begins to be eliminated from the

4  body—assuming, of course, the body experiences no additional PFAS chemical exposure.[42]

5      93.    In the face of these findings, and despite passage of the Toxic Substances Control

6  Actin 1976, which requires companies that manufacture, process or distribute chemicals to

7  immediately report to the Environmental Protection Agency ("EPA") information that "reasonably

8  supports the conclusion" that a chemical presents a substantial risk to health or the environment,

9  Defendants did not inform the EPA, their consumers, firefighters, including MR. GOMES,

10  PLAINTIFFS, or the public about the health impacts resulting from exposure to PFAS.[43] Indeed, in

11  at least some instances, Defendants' own attorneys advised the companies to conceal their damaging

12  findings on PFAS, which they did for decades.[44]

13     94.    In 2000, 3M announced that it would cease manufacturing a specific PFAS chemical,

14  PFOS, as well as Class B foam, on the same day the EPA announced that PFOA and PFOS, two

15  chemicals in the PFAS family, had a "strong tendency to accumulate in human and animal tissues

16  and could potentially pose a risk to human health and the environment over the long term."[45]

17     95.    However, 3M did not recall PFOS, its chemical feedstock, Class B foam that it had

18  previously manufactured, sold, or distributed, or that was then stored at firehouses and being used by

19  firefighters around the country. And, no other Defendant stopped manufacturing PFAS chemicals or

20  products containing PFAS. Rather, Defendants continued to manufacture, develop, market, promote,

21  distribute and sell PFAS chemicals and PFAS-containing products, including specifically PFAS-

22  containing turnouts, and Class B foams and did so without any warning to firefighters or to the public

23  concerning the fact that these turnouts and foams contained PFAS, or that they posed a serious health

24

25  _____
   [41] *Id.* at fn. 28.
26  [42] *Id.*
   [43] *Id.*
27  [44] *Id.* at fn. 28.
   [45] *EPA and 3M Announce Phase Out of PFOS*, Press Release, United States Environmental Protection Agency (May 16,
28  2000), https://archive.epa.gov/epapages/newsroom_archive/newsreleases/33aa946e6cb11f35852568e1005246b4.html.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1  risk to human health. Defendants instead continued to claim their products were safe.

2      96.    By the 2000s, Defendants' own research of its employees revealed multiple adverse

3  health effects among workers who had been exposed to PFAS, including increased cancer incidence,

4  hormone changes, lipid changes, and thyroid and liver impacts.[46]

5      97.    In 2001, a class action lawsuit was filed in West Virginia against DuPont on behalf of

6  people whose water had been contaminated by the nearby DuPont chemical plant where PFAS

7  chemicals were manufactured.

8      98.    Defendants continued to manufacture, market, promote, distribute, and sell PFAS and

9  PFAS-containing products, including turnouts and Class B foam, and continued to publicly claim that

10  these products were safe. Defendants affirmatively suppressed independent research on PFAS, and

11  instead commissioned research and white papers to support their claims that PFAS and PFAS-

12  containing products were safe to use, engaging consultants to further this strategy and ensure that

13  they would continue to profit from these toxic chemicals and products.

14      99.    As one consultant wrote in pitching its services to DuPont, it was critical that the PFAS

15  industry develop an aggressive strategy to "[discourage] governmental agencies, the plaintiffs' bar

16  and misguided environmental groups" and "[implement] a strategy to limit the effect of litigation and

17  regulation on the revenue stream generated by PFOA." The strategy was further described by

18  consultant as follows:

19          DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS.... The
            outcome of this process will result in the preparation of a multifaceted plan
20          to take control of the ongoing risk assessment by the EPA, looming
            regulatory challenges, likely litigation, and almost certain medical
21          monitoring hurdles. The primary focus of this endeavor is to strive to create
            the climate and conditions that will obviate, or at the very least, minimize
22          ongoing litigation and contemplated regulation relating to PFOA. *This
            would include facilitating the publication of papers and articles
23          dispelling the alleged nexus between PFOA and teratogenicity as well as
            other claimed harm.* We would also lay the foundation for creating Daubert
24          precedent to discourage additional lawsuits.[47]

25

26

27  _____
    [46] *Id.* at fn. 28.

28  [47] Letter from P. Terrence Gaffney, Esq of The Weinberg Group to Jane Brooks, Vice President, Special Initiatives, DuPont de Nemours & Company, regarding PFOA (April 29, 2003).

COMPLAINT

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

100.    Class B foam manufacturers and distributors adopted a similarly aggressive industry campaign to evade government oversight or public attention of the risks posed by their products. At a March 2001 meeting of the National Fire Protection Association's Technical Meeting on Foam, which included Defendant Class B foam manufacturers Tyco, Chemguard and National Foam, a 3M representative informed attendees that 3M had discontinued its Class B foam business, citing concerns about the "proven pervasiveness, persistence and toxicity" of PFOS.[48] Attendees also were informed of evidence that telomer-based fluorosurfactants (used by every Class B foam manufacture except 3M) degrade to PFOA and, worse, exhibit an even greater degree of pervasiveness and toxicity than PFOA.

101.    On or about the same time, certain Defendants, including at least Tyco, DuPont, Dynax, Kidde, and Buckeye, founded and/or became members of the Fire Fighting Foam Coalition ("FFFC") – a non-profit organization of manufacturers, distributors and suppliers of Class B foam (specifically AFFF).[49] The FFFC's self-described role was to be "the environmental voice for users and manufacturers of AFFF" – one designed to ignore the health impacts of exposure to PFAS-containing Class B foams such as AFFF:

> Not too long ago, 3M had environmental concerns about a chemical in their product and decided to withdraw from the AFFF market. Even though no other manufacturers used the questionable chemical, the withdrawal of 3M from AFFF production raised a red flag. As a direct result, a lot of half-truths and misinformation published by some well-meaning, but misinformed, groups began to surface. One organization went so far as to label our products as "hazardous waste" and as posing an "occupational health or environmental hazard." At the same time, the Federal government was focusing its attention on the industry and needed to identify an industry representative that could provide fact-based information and serve as a focal point for dialogue. We decided, therefore, to form the FFFC in order to educate, inform and help persuade regulatory and legislative decision-makers that firefighting foams are a value-added component to any firefighting capability.[50]

102.    Defendants also pivoted with a new industry strategy. Defendants continued to

---

[48] NFPA-11 Technical Committee Meeting Notes (National Fire Protection Association for Standards on Low-, Medium- and High-Expansion Foam) (March 14-15, 2001),  https://assets.documentcloud.org/documents/4178280/NFPA-Schedule.pdf.

[49] Fire Fighting Foam Council Website (last visited February 26, 2021), https://www.fffc.org/.

[50] Id. at https://web.archive.org/web/20020811142253/http:/www.fffc.org/about.html (captured August 11, 2002).

27

COMPLAINT

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1    produce Class B foams containing PFAS and continued to publicly represent that PFAS and/or

2    products containing PFAS were safe, while developing newer, "short-chain" PFAS alternatives.

3        103.   In 2005, the EPA fined DuPont $16.5 million for failing to submit decades of toxicity

4    studies of PFOA (one PFAS chemical manufactured by the company).[51] In the face of and undeterred

5    by the EPA's action, Defendant turnout manufacturers, such as MSA (Globe) and Lion, partnered

6    with DuPont and with Defendant Gore to develop, manufacture, market, distribute and turnouts made

7    with DuPont's and/or Gore's PFAS-based textile coatings (e.g., Nomex® and Gore® Protective

8    Fabrics).[52]

9        104.   In 2006, the EPA "invited" eight PFOA manufacturers, including Defendants DuPont,

10    3M, Arkema, and Daikin to join in a "Global Stewardship Program" and phase out production of

11    PFOA by 2015.[53]

12        105.   By this time, Defendants had begun to aggressively manufacture, market and/or

13    distribute short-chain PFAS, such as Gen X, claiming that these alternative PFAS chemicals did not

14    pose significant health risks to humans or the environment. But, these claims, too, were false.

15    Defendants knew that certain of these short-chain PFAS chemicals had been found in human blood,

16    and that at least one of them produces the same types of cancerous tumors (testicular, liver, and

17    pancreatic) in rats as had been found in long-chain PFAS studies.[54]

18        106.   In 2011, a C8 Science Panel convened as part of a settlement in the West Virginia

19    DuPont water contamination case described above, began releasing its findings. The Panel had

20    analyzed the blood serum of nearly 70,000 residents living in the water contamination area for two

21    long-chain PFAS (PFOA and PFOS), and found significant negative human health effects (including,

---

[51] Michael Janofsky, *DuPont to Pay $16.5 Million for Unreported Risks*, New York Times (December 5, 2005), https://www.nytimes.com/2005/12/15/politics/dupont-to-pay-165-million-for-unreported-risks.html.

[52] *DuPont and LION Collaborate to Better Protect Firefighters and First Responders*, Press Release, DuPont and LION (January 30, 2013), https://www.prweb.com/releases/dupont_protection_tech/lion_turnout_gear/prweb10362363.htm; *Our Partners*, Globe Website (last visited February 26, 2021), https://globe.msasafety.com/our-partners; and *Firefighter & Emergency Response Protection,* DuPont Website (last visited February 26, 2021), https://www.dupont.com/personal-protection/firefighter-protection.html.

[53] *PFOA Stewardship Program*, United States Environmental Protection Agency (last visited February 26, 2021), https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-management-and-polyfluoroalkyl-substances-pfas#tab-3.

[54] Sharon Lerner, *New Teflon Toxin Causes Cancer in Lab Animals*, The Intercept (March 3, 2016), https://theintercept.com/2016/03/03/new-teflon-toxin-causes-cancer-in-lab-animals/.

28

COMPLAINT

kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, high cholesterol and preeclampsia) associated with exposure to these PFAS chemicals in the area groundwater.

107.    In 2013, DuPont entered an agreement with the EPA and ceased production and use of PFOA – just one of thousands of PFAS chemicals the company makes, promotes and sells. Defendants, however, continued manufacturing short-chain PFAS materials, chemical feedstock, and products—all the while peddling them as safer, and as more easily bio-degraded than long-chain PFAS, despite evidence to the contrary.[55]

108.    In 2015, DuPont spun-off its PFAS chemicals business, as well two-thirds of its environmental liabilities and 90% of its active litigation, to Defendant Chemours. As part of the transaction, DuPont required Chemours to indemnify the "new" DuPont for all assigned environmental liabilities should a regulatory agency or plaintiff seek to hold the "new" DuPont accountable. As Chemours President Paul Kirsch testified before Congress: "DuPont designed the separation of Chemours to create a company where it could dump its liabilities to protect itself from environmental cleanup and related responsibilities."[56]

109.    In June 2018, the Agency for Toxic Substances and Disease Registry (ASTDR), a division of the Centers for Disease Control and Prevention at the US Department of Health and Human Services released an 852-page draft toxicology report analyzing scientific data about the most common PFAS chemical variants, finding that PFAS "are potentially more hazardous than previously known, are particularly concerning because of these compounds' persistence in the environment and widespread prevalence—PFAS are extremely slow to biodegrade."[57]

110.    In September 2019, DuPont chief operations and engineering officer Daryl Roberts testified before Congress that the "new DuPont" (to be distinguished from the "old DuPont" which manufactured and sold PFAS for decades before being spun-off to Chemours) no longer uses or manufactures PFAS and is no longer responsible for obligations and harms resulting from over 65

---

[55] *Id.* at fn. 19, *see* Tom Neltner, http://blogs.edf.org/health/2019/02/20/potential-biopersistence-short-chain-pfas/.
[56] *Id.* at fn. 36.
[57] *A Toxic Threat: Government Must Act Now on PFAS Contamination at Military Bases*, Center for Science and Democracy (September 2018), https://www.ucsusa.org/sites/default/files/attach/2018/09/a-toxic-threat-pfs-military-fact-sheet-ucs-2018.pdf.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

years of producing PFAS.[58] Roberts further testified that he knew nothing about "old DuPont's"
efforts to suppress research on PFAS' toxicity as testified to by one of DuPont's former scientists
only a few days earlier.[59] Finally, he stated that any liabilities from "old DuPont's" PFAS operations
were now Chemours' problem because DuPont is essentially a completely new company with no past
– only a bright future of doing good in the world.[60]

**E. Defendants Failed to Warn Firefighters, Including CAPTAIN GOMES, of the
Dangers of Exposure to PFAS and Falsely Represented That Their PFAS Products Were
Safe**

111.    As alleged above, Defendants knew that PFAS are persistent, toxic, and bio-
accumulating with a very long half-life. They knew that exposure to PFAS can cause serious and life-
threatening diseases, including cancer.

112.    Yet, Defendants *did not warn* firefighters, including CAPTAIN GOMES, that PFAS
and Defendants' PFAS-containing products, including turnouts and Class B foams used by
firefighters, including CAPTAIN GOMES, contained PFAS, or that exposure to PFAS in the normal
and intended use of such products, causes serious bodily harm and illnesses, including cancer.

113.    Instead, Defendants falsely represented that PFAS and PFAS-containing products,
including turnouts and Class B foams, are safe and not harmful to humans or the environment.

114.    Such assertions fly in the face of science and a global movement toward eliminating
this class of chemicals from consumer products. In recent years, for example, Congress passed
legislation to address PFAS in turnouts and foam,[61] and numerous states have severely restricted
and/or banned PFAS-containing firefighting foam with California and Colorado also banning PFAS-
containing turnouts as of 2022.[62] The U.S. Food and Drug Administration similarly has called for

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

---

[58] *Id.* at fn. 36.
[59] *Id.*
[60] *Id.*
[61] Ryan Woodward, *Congress Passes Legislation to Address PFAS Chemicals Impacting Firefighters,* Fire Rescue 1, (December 17, 2020), https://www.firerescue1.com/legislation-funding/articles/congress-passes-legislation-to-address-pfas-chemicals-impacting-firefighters-Sp8MFif5dAbD4ZrI/.
[62] Andrew Wallender, *Toxic Firefighting Foam With PFAS Scrutinized by Multiple States,* Bloomberg Law (June 18, 2020),    https://news.bloomberglaw.com/pfas-project/toxic-firefighting-foam-with-pfas-scrutinized-by-multiple-states; (footnote continued)

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1  phasing out of short-chain PFAS that contain 6:2 fluorotelomer alcohol (6:2 FTOH).[63] And private

2  companies like Home Depot, Lowes and Staples recently have begun to discontinue selling products

3  containing any PFAS, as have several outdoor, durable clothing companies (e.g. Columbia and

4  Marmot), clothing retailers (e.g. H&M, Levi Strauss & Co), shoe companies (e.g. Adidas and New

5  Balance), car seat manufacturers (e.g. Britax and Graco), furniture companies (e.g. IKEA), personal

6  care companies (e.g. Johnson & Johnson and Oral-B), and textile manufacturing companies.[64]

7  **(1) Defendants Provide No Safety Warnings on Product Labels**

8      115.    PLAINTIFFS allege that the packaging on the PFAS-containing Class B foam

9  containers used for mixing Class B foam with water, pumping the mixture into engines, and for

10  spraying and laying foam blankets for fire suppression or fire suppression training, contained no

11  warning that the Class B foam contained PFAS. Nor did it inform persons handling or using the foam

12  as it was intended to be handled that such use can result in exposure to PFAS and serious bodily harm.

13      116.   The labels on the containers for Class B foam warn only of possible skin or eye

14  irritation, and suggest rinsing areas of contact with water. They contain *no information* about the

15  Class B foam containing PFAS or PFAS-containing materials, and provide *no warning whatsoever*

16  of the human health risks and serious health conditions associated with PFAS exposure resulting from

17  the normal and intended use of Class B foam in fire suppression or fire suppression training.

18      117.    PLAINTIFFS further allege that turnouts containing PFAS or PFAS materials sold

19  or distributed by Defendants in California, and used by firefighters, including CAPTAIN

20

21

Cheryl Hogue, *California Bans PFAS Firefighting Foams*, Chemical & Engineering News (October 1, 2020), https://cen.acs.org/environment/persistent-pollutants/California-bans-PFAS-firefighting-foams/98/i38#:~:text=California%20is%20halting%20the%20sale,US%20market%20to%20do%20so; Marianne Goodland, *While Dozens of Bills Are Getting Axed, A Bill on Firefighting Chemicals Sails On*, Colorado Politics (May 28, 2020), https://www.coloradopolitics.com/legislature/while-dozens-of-bills-are-getting-axed-a-bill-on-firefighting-chemicals-sails-on/article_1b1e05f2-a11e-11ea-a270-230a36e06594.html; *Legislature Takes Strongest Stand Yet to Phase out PFAS in Firefighting Foam*, Washington State Council of Fire Fighters (March 5, 2020), https://www.wscff.org/legislature-takes-strongest-stand-yet-to-phase-out-pfas-in-firefighting-foam/.

[63] *FDA Announces the Voluntary Phase-Out by Industry of Certain PFAS Used in Food Packaging*, U.S. Food and Drug Administration, July 31, 2020, https://www.fda.gov/food/cfsan-constituent-updates/fda-announces-voluntary-phase-out-industry-certain-pfas-used-food-packaging.

[64] Muhannad Malas, *Home Depot, Lowe's and Staples Take Action to Protect Their Customers from PFAS and Other Harmful Toxics Lurking in Carpets and Office Supplies*, Environmental Defence (November 5, 2019), https://environmentaldefence.ca/2019/11/05/home-depot-lowes-staples-protect-customers-toxics/; *PFAS-Free Products*, PFAS Central, (last visited February 15, 2021), https://pfascentral.org/pfas-free-products/.

31

COMPLAINT

1  GOMES, in training, emergency incidents, or in fire suppression during their firefighting

2  careers, also contained no warning that the turnouts contain PFAS or PFAS materials. Nor did

3  these labels inform persons handling, wearing, or using the turnouts as they were intended to be

4  handled, worn or used can result in exposure to PFAS and serious bodily harm.

5      118.    The labels for the turnouts made no mention of PFAS, did not advise that the

6  turnouts contain PFAS or PFAS materials, and contained no warning that handling, wearing, or

7  using the turnouts as they were intended to be handled, worn or used can result in exposure to

8  PFAS and serious bodily harm. Further, while the labels provide washing instructions, the

9  instructions do not advise that turnouts should be washed in a commercial extractor to prevent

10  cross-contamination and PFAS-exposure to family members who handle or wash the turnouts

11  with other garments in home washing machines.

12      **(2) Defendants' MSDS Sheets Do Not Warn About PFAS or PFAS Exposure**

13      119.    A Material Safety Data Sheet (or "MSDS") is a document that Occupational

14  Safety and Health Administration (OSHA) requires companies to provide to end users for

15  products that contain substances or chemicals that are classified as hazardous or dangerous.

16  Access to such information is necessary for firefighters, including CAPTAIN GOMES, to

17  provide a safe and effective response in emergency situations.

18      120.    The MSDS provided with Defendants' Class B foams did not – and to this day do

19  not – state that these foams contain PFAS or PFAS-containing materials; that PFAS is persistent,

20  toxic and bio-accumulating; or that PFAS exposure causes serious bodily harm. To the contrary,

21  the MSDS falsely stated that the Class B foams and/or their contents were not known carcinogens

22  and did not cause birth defects.

23      121.    Even as recently as November 2020, the MSDS did not reflect the known serious

24  health risks and hazards associated with exposure to PFAS in Class B foams. For example, a

25  MSDS updated on November 20, 2020, by Defendant National Foam for AFFF stated the product

26  was not carcinogenic or toxic - contrary to decades of science.[65]

27  _____

28  [65] National Foam Safety Data Sheet for Centurion (TMC6) 6% Aqueous Film Forming Foam Concentrate (AFFF)
(footnote continued)

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

**(3) Defendants' Misrepresentations About PFAS Continue to this Day**

122. Despite their decades of knowledge about PFAS and its dangers, Defendants continue to make false claims, continue to misrepresent the safety of PFAS, and continue to minimize and fail to warn about the hazards of exposure to PFAS, or turnouts and Class B foams made with or containing PFAS.

123. Defendants' misinformation campaign is long-standing, and continues to this day. Some pertinent examples include:

    a. 2017 – Defendant Lion's President, Stephen Schwartz, wrote a letter to the editor of the Columbus Dispatch, expressing outrage at the assertion in a government filing that firefighters may have been exposed to PFAS through turnout gear. Schwartz called this assertion false, stating that Lion's turn-out gear is not treated or made with PFOS or PFOA:. "PFOAs and PFOSs have never been components of LION's turn-out gear, either as a coating or as a textile." He acknowledged that turn-out gear is treated with PTFE to provide a durable water repellant, and that the textile industry in the past had used PFOA as a processing aid to manufacture PTFE moisture barrier films and repellants. "It is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into LION's turn-out gear. *However, based on all available scientific data, such nominal trace amounts, if they existed at all, would not have posed any health risk to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear*." (Emphasis added).[66]

    b. 2018 – The National Fire Protection Association (which maintains committees on foams and turnouts that are comprised, in part, of certain Defendants) issued a publication listing 11 ways to minimize risk of occupational cancer – the suggestions centered on wearing turnouts for protection resulting from combustion or spills, and cleaning turnouts after exposure to chemicals. There was not a single mention of avoiding contact with foam and/or the risks of wearing turnouts containing PFAS or PFAS-containing materials.[67]

    c. 2019 – Defendant 3M Vice President, Denise Rutherford, testified before Congress that she *absolutely agreed with the statement that "the*

---

(November 20, 2020), https://nationalfoam.com/wp-content/uploads/sites/4/NMS340-Centurion-6-AFFF-Concentrate_11302020.pdf.

[66] Letter from LION president Stephen A. Schwartz to Ala D. Miller, Editor, The Columbus Dispatch (October 30, 2017), http://files.constantcontact.com/bf8abd7a001/01f5d727-d72e-42dc-971b-caa9c2855800.pdf.

[67] *11 Best Practices for Preventing Firefighter Cancer Outlined in New Report Put Out by VCOS and NVFC*, National Fire Protection Association Xchange (August 16, 2018), https://community.nfpa.org/community/nfpa-today/blog/2018/08/16/11-best-practices-for-preventing-firefighter-cancer-outlined-in-new-report-put-out-by-vcos-and-nvfc.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

33

COMPLAINT

*weight of current scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current rates of exposure.*" (emphasis added)[68]

d. 2019 - The Fire Fighting Foam Council (of which many Defendants have been members since its inception in 2001) wrote in their newsletter that: "Short-chain (C6) fluorosurfactants do not contain or breakdown in the environment to PFOS or PFOA and are currently considered lower in toxicity and have significantly reduced bio-accumulative potential than long-chain PFAS."[69]

e. 2020 - FluorCouncil – the lobbying arm of the PFAS industry – maintains that PFAS fluorotelomers that are in Class B foam and turnouts do not cause cancer, disrupt endocrine activity, negatively affect human development or reproductive systems, do not build up in the human body, and do not become concentrated in the bodies of living organisms.[70]

f. 2020 – The Fire Fighting Foam Council website states: "The short-chain (C6) fluorosurfactants that have been the predominant fluorochemicals used in fluorotelomer-based AFFF for the last 25 years are low in toxicity and considered to be bio-accumulative based on current regulatory criteria."[71]

g. 2020 – The Fire Fighting Foam Council's Best Practice Guidance for Use of Class B Foam - which was published in May 2016 and has not been updated to reflect the latest research - focuses entirely on eliminating and containing foam to minimize impact on the environment. It makes no mention of how to minimize the impact on firefighters who routinely handle, prepare, spray, or use Class B foam during training or in firefighting.[72]

124.    As frequent sponsors and advertisers in fire service publications, Defendants have been so influential in the industry that fire service leadership have echoed these narratives.

125.    For example, in 2017, the International Association of Fire Fighters ("IAFF"), which represents more than 324,000 full-time professional firefighters, issued a statement that

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

---

[68] Gabe Schneider, *3M Grilled over PFAS Chemicals at Congressional Hearing*, MinnPost (September 11, 2019), https://www.minnpost.com/national/2019/09/3m-grilled-over-pfas-chemicals-at-congressional-hearing/.
[69] *AFFF Update Newsletter*, Fire Fighting Foam Council (April 2019), https://tinyurl.com/y57c5jwx.
[70] *An Important Update About FluoroCouncil*, FluoroCouncil, Global Industry Council for Fluoro Technology (last visited September 7, 2020), https://fluorocouncil.com/important-update-about-fluorocouncil/.
[71] *Fact Sheet on AFFF Fire Fighting Agents*, Fire Fighting Foam Council (2017), https://tinyurl.com/yyxscyas.
[72] *Best Practice Guidance for Use of Class B Firefighting Foams*, Fire Fighting Foam Council (May 2016), https://tinyurl.com/2kzdsed9.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1  both mischaracterized and purported to state that the risks associated with exposure to PFAS and

2  PFAS chemicals and materials in turnouts and Class B foams was minimal to non-existent. The

3  statement even encouraged firefighters to continue to wear turnouts and use legacy Class B

4  foams, creating a false sense that these PFAS-containing turnouts and foams were safe. The

5  statement reads, in relevant part:

> Importantly, PFOA use has been almost completely phased out in the US....Fire fighters may have additional PFOA exposure sources such as older Class B firefighting foams. If PFOA is a combustion product of PFOA-containing consumer products made prior to phasing out use of this chemical, fire fighters will be exposed in fire suppression activities. However, the data are too limited at present to determine this. PFOA is unlikely to be a component in recently US manufactured turnout gear. However, if PFOA is a combustion product, it may be present as a contaminant on turnout gear. PFOA may also be present as a manufactured component of legacy turnout gear....The exposure contribution from any such PFOA content is likely to be minimal since volatilization from the manufactured product would be required....**At this time, IAFF does not recommend that legacy turnout gear be replaced outside of its lifecycle. Fire fighters wishing to minimize PFOA exposure should continue to wear their PPE...and regularly decontaminate their turnout gear**. IAFF will continue to monitor developments and update this fact sheet should new information become available.[73]

17    126.    The IAFF maintained this position until January 2021 when IAFF members

18  demanded that the IAFF leadership hold turnout and Class B foam manufacturers accountable.[74]

19    127.    Because of these and other false claims and misrepresentations on the part of

20  Defendants, firefighters, including CAPTAIN GOMES, did not know and, in the exercise of

21  reasonable diligence, could not have known that the turnouts and Class B foams they used

22  contained PFAS or PFAS-containing materials, and caused firefighters, including CAPTAIN

23  GOMES, to be exposed to PFAS and/or PFAS-containing materials, causing them to suffer

24  cancers and other serious illnesses as a result of such exposure.

---

[73] Best Practice Guidance for Use of Class B Firefighting Foams, Fire Fighting Foam Council (May 2016), https://tinyurl.com/2kzdsed9.

[74] Statement on PFOA and Turnout Gear, International Association of Firefighters, (May 2017), https://tinyurl.com/y29mfh69.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

**F. New Research Indicates That Firefighters are at Significant Risk of Harm From Exposure to PFAS in Turnouts and Class B Foams — But Defendants Continue to Discount or Deny These Risks**

128.    While historical research (and litigation) has centered on environmental impacts and environmental exposures associated with PFAS and PFAS-containing products, recent studies have focused specifically on the serious health impacts to firefighters stemming from their occupational exposure to turnouts and Class B foams containing PFAS.

129.    In October 2019, for example, an expert panel of the International Pollutants Elimination Network (IPEN), an international non-profit organization comprised of over 600 public interest non-governmental organizations dedicated to improving global chemical waste policies, published a scientific paper that, in the words of its authors, "presents unequivocal evidence from recent studies that firefighters" using Class B foams (primarily AFFF) "have unexpectedly elevated blood levels" of PFAS, including, specifically, PFHxS and PFOS, with PFHxS (a short-chain, C6 PFAS) being "potentially of greater concern than PFOS given its much longer elimination half-life in humans."[75]

130.    The paper explains that "[f]irefighters can be significantly exposed to PFHxS and other PFAS from firefighting foam via various occupational mechanisms including direct exposure during use as well as exposure from contaminated personal protective equipment (PPE), handling of contaminated equipment, managing PFAS foam wastes, occupation of contaminated fire stations and consumption of contaminated local water and produce. Cross-contamination and legacy PFAS residues from inadequately decontaminated appliances after transitioning to fluorine-free foam can remain a long-term problem."[76]

131.    The panel concluded that "[o]ngoing exposure to PFHxS, PFOS and other PFAS amongst firefighters remains a major occupational health issue," noting that "[b]io-accumulation and very slow bio-elimination may be very significant influencing factors in PFHxS exposure"

---

[75] *Perfluorohexane Sulfonate (PFHxS) – Socio-Economic Impact, Exposure and the Precautionary Principle Report*, IPEN Expert Panel (October 2019), https://ipen.org/sites/default/files/documents/pfhxs_socio-economic_impact_final_oct.2019.pdf.
[76] *Id*. at p. 25.

1  in firefighters.[77] "Of greater concern," the panel observed, "is that firefighter blood levels for

2  PFOS and PFHxS are many times higher than the median values for the general…population."[78]

3      132.    In June 2020, scientists at the University of Notre Dame published a ground-

4  breaking study on PFAS in turnout gear, and the exposure risks posed to firefighters that wear,

5  wore, or handle such gear ("Notre Dame Turnout Study"). The Notre Dame Turnout Study

6  analyzed over 30 sets of used and unused (still in their original packaging) turnout gear made by

7  six U.S. manufacturers, including Defendants MSA/Globe, Lion and Honeywell, over several

8  production years, as listed below:[79]

| PPE gear manufacturers sampled: | # samples |
|---|---|
| Globe Manufacturing (Pittsfield MA), | 11 |
| Lion Group (Dayton OH), | 12 |
| Honeywell First Responder (Dayton. OH). | 2 |
| Lakeland Fire (Decatur, AL) | 2 |
| Quest Fire Apparel (Saratoga Springs, NY) | 1 |
| Quaker Safety (Quakertown, PA) | 2 |

The type and number of turnout gear samples used in this study.

14      133.    The Notre Dame Turnout Study noted that these manufacturers' turnout gear (or

15  personal protective equipment-PPE, as it is described in the study) are manufactured "from

16  textiles that are made from fluoropolymers (one form of PFAS) or extensively treated by PFAS

17  in the form of side-chain fluoropolymers."[80] According to the researchers, "[t]hese PFAS include

18  fluoropolymer materials such as PTFE used as a moisture barrier in the inner layers of turnout

19  gear."[81] The study found significant levels of PFAS chemicals – including PFOA, PFOS, PFBA,

20  PFPeA, PFHxA, PFHpA, PFNA, PFDA, PFUnA, PFDoA, PFTrDA, PFToDA, PFBS, PFOSA,

21  N-EtFOSA, MeFOSAA, N-MeFOSE, N-EtFOSE and 6:20FTS – in both new and used turnout

22  gear, and across layers, portions, and materials in the turnout gear, including in material layers

23  that are not intentionally treated with PFAS by the manufacturer, thereby providing "the first

24  evidence that suggests PFAS appear to migrate from the highly fluorinated layers and collect in

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

---

[77] Id.
[78] Id.
[79] Id. at fn. 7.
[80] Id. at p. A.
[81] Id.

37
COMPLAINT

the untreated layer of clothing worn against the skin."[82]

134.    These findings suggest that, as the garments are worn, PFAS from the outer shell and the moisture barrier can migrate from the turnouts and contaminate both the firefighter, their apparatus and workplace with PFAS. The analysis also indicated that fluoropolymers from the outer layer decompose into other PFAS, including PFOA.

| Environmental Science & Technology Letters | | | | | | pubs.acs.org/journal/estlcu | | letter |

Table 2. Quantities of Target PFAS (in ppb) Found in US Turnout Gear by LC−MS/MS Analysis

| value in ppb | jacket 2008 unused | | | pants 2014 used | | | jacket 2008 used | jacket 2017 unused |
| | thermal liner | moisture barrier | outer shell | thermal liner | moisture barrier | outer shell | moisture barrier | moisture barrier |
|---|---|---|---|---|---|---|---|---|
| PFBA | <MDL | 128 | 106 | 139 | 615 | 215 | 205 | 991 |
| PFPeA | <MDL | 12.6 | 17.8 | 228 | 104 | 164 | 18.1 | 249 |
| PFHxA | <MDL | 30.5 | 369 | 199 | 286 | 109 | 358 | 369 |
| PFHpA | <MDL | 12.4 | 25.4 | 105 | 5.82 | 223 | 14.3 | 25.4 |
| PFOA | 78 | 46 | 182 | 850 | 71 | 97 | 37 | <MDL |
| PFNA | 2.63 | <MDL | 8.2 | 25.3 | 1.35 | <MDL | 2.96 | <MDL |
| PFDA | 29.8 | 6.51 | 5.51 | 133 | <MDL | <MDL | 23.7 | <MDL |
| PFUnA | <MDL | <MDL | <MDL | 7.96 | <MDL | <MDL | 2.51 | <MDL |
| PFDoA | <MDL | 5.01 | <MDL | 68.6 | <MDL | <MDL | 2.59 | <MDL |
| PFBS | 283 | 140 | 142 | 53400 | 47900 | 1050 | 230 | 90400 |
| PFOS | <MDL | <MDL | <MDL | 7 | <MDL | <MDL | 2 | <MDL |
| 6:2 FTS | <MDL | <MDL | <MDL | 259 | 129 | <MDL | <MDL | <MDL |
| 8:2 FTS | <MDL | <MDL | <MDL | 111 | <MDL | <MDL | <MDL | <MDL |

135.    "Startlingly," researchers reported, "garment to hand transfer of total fluorine in the ppm range was also observed when researchers simply manipulated the textiles in [the] laboratory."[83] The accumulation of PFAS on researchers' hands strongly suggests that transference of ppm levels of PFAS can occur merely by handling the turnouts and that PFAS exposure pathways include inhalation, ingestion and/or absorption (through dermal contact) – all of which DuPont internally acknowledged as being toxic in 1980. Such exposure pathways are a concern not only for firefighters that rely on turnouts to protect them from heat, fire, water and chemical hazards in the field, but to family members who may be exposed to the PFAS in turnouts as the result of home washing or storage. Lead researcher Graham Peaslee commented that turnouts are "the most highly fluorinated textiles I've ever seen"[84] and that the level of PFAS

---

[82] *Id.* at p. C.

[83] *Id.*

[84] Raleigh McElvery, *Protective Gear Could Expose Firefighters to PFAS*, Chemical and Engineering News (July 1, (footnote continued)

BALABAN & SPIELBERGER LLP
11859 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

in the turnout gear means that firefighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high..."[85]

136.    Despite these findings, Defendants have been quick to mischaracterize, dismiss or downplay the significance of the Notre Dame Turnout Study. Defendant MSA/Globe, when contacted about the study and asked whether Globe planned to study this issue and find an alternative to PFAS for turnouts, merely responded thusly: "[P]rotecting (firefighters) is Globe's business; every piece of our turnout gear meets or exceeds applicable industry standards."[86]

137.    Defendant Lion's responses have been similar, and have also dismissed or minimized the significance of the Notre Dame Turnout Study's findings. Lion issued a Customer Safety Alert for PFOA and Turnout Gear stating: "Your LION turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."[87]

138.    The Customer Safety Alert goes on to stress that Lion does not use PFOA or PFOS (two long-chain PFAS chemicals) in its turnouts.[88] It does not, however, address that the maker's turnouts in fact contain other PFAS chemicals, nor warn firefighters or the public about health harms associated with exposure to these toxic, bio-accumulating chemicals.

139.    Defendant Lion's paid consultant, Dr. Paul Chrostowski, also has taken aim at the Notre Dame Turnout Study and its findings. Refuting a *Fire Rescue* magazine article about the study,[89] Chrostowski repeated Lion's website statement that "PFOA was never part of the gear itself and frequent independent testing has found only trace amounts of it in any of the gear –

---

2020),    https://cen.acs.org/environment/persistent-pollutants/Protective-gear-expose-firefighters-PFAS/98/i26?fbclid=IwAR3ktyIcasjnxHiv3RNDRJldZmunQIeAEoS3Av225uOscj2hFbffVcO3-Go.

[85] Andrew Wallender, *Firefighters Face New Possible Risk From Toxic PFAS: Their Gear*, Bloomberg Law (June 23, 2020), https://news.bloomberglaw.com/pfas-project/firefighters-face-new-possible-risk-from-toxic-pfas-their-gear.

[86] Blair Miller, *Local Firefighters Concerned About Potentially Dangerous Chemicals on Gear*, Boston 25 News (February    26,    2019),    https://www.boston25news.com/news/local-firefighters-facing-concerns-over-potentially-dangerous-chemicals-on-gear/92523612/.

[87] LION    Customer    Safety    Alert    –    PFOA    and    Turnout    Gear    (April    24,    2019), https://cdn2.hubspot.net/hubfs/3475623/LION_PFOA_factsheet_042419.pdf.

[88] *Id.*

[89] Larissa Conroy, *What If I Told You That Your Bunker Gear Was Causing Cancer?*, Fire Rescue (May 28, 2020), https://www.firefighternation.com/firerescue/what-if-i-told-you-that-your-bunker-gear-was-causing-cancer/#gref.

39

COMPLAINT

1  not nearly enough to cause concern, and in amounts similar to consumer products."[90]

2  Chrostowski went on to say "[t]he fact is that one may find trace amounts of 'short-chain' PFAS

3  such as PFBS and PFHxA in firefighting textiles, but the scientific research shows that these

4  materials are far less toxic than even PFOA and at the tiny trace levels the risk are extremely

5  low based on numerous credible published scientific research papers."[91] Finally, Chrostowski

6  falsely stated that the link between PFAS exposure and cancer is "extremely weak."[92]

7      140.    And yet, Lion concedes that dermal absorption is a pathway of exposure to cancer-

8  causing chemicals for firefighters. In a *Not in Our House* cancer awareness fact sheet that

9  currently appears on the company's website, Lion warns firefighters: "For every 5 degree

10  increase in temperature, skin becomes 400% more absorbent. The hotter you are, the more

11  carcinogens your skin absorbs.[93] This statistic is alarming given that the core body temperature

12  of firefighters routinely increases during firefighting activities while wearing turnouts which

13  contain known carcinogens.[94]

14      141.    The IAFF holds a yearly cancer summit and yet has done little to address the PFAS

15  in turnouts.[95] Defendants, including at least DuPont, Gore, Lion and MSA (Globe), have been

16

17  [90] Paul Chrostowski, Ph.D., QEP, *Research and Independent Testing Shows Firefighters' Turnout Gear Remains Safe

18  Despite Claims*, Fire Rescue (June 3, 2020). https://firerescuemagazine.firefighternation.com/2020/06/03/research-and-independent-testing-shows-firefighters-turnout-gear-remains-safe-despite-claims/ - gref.

19  [91] *Id.*
   [92] *Id.*

20  [93] LION website, https://cdn2.hubspot.net/hubfs/3475623/NOT IN OUR HOUSE Tip Sheet_Infographic (02-02-19).pdf
   (last visited February 26, 2021).

21  [94] Nancy Espinoza, *Can We Stand the Heat?*, Journal of Emergency Medical Services, (April 30, 2008),

22  https://www.jems.com/operations/can-we-stand-heat-study-reveal/; Gavin P. Horn, et al., *Thermal Response to
   Firefighting Activities in Residential Structure Fires: Impact of Job Assignment and Suppression Tactic*, Ergonomics
   (July 31, 2017), https://tinyurl.com/4j2mz7f7.

23  [95] As alleged above, in para. 126, fn. 77, IAFF has only recently begun to take action related to PFAS exposure due to

24  pressure from its firefighter members. At the IAFF Annual Meeting in January 2021, two groundbreaking PFAS-related
   firefighter safety resolutions passed with the support of 99% of the membership. The resolutions require IAFF to: (1)

25  sponsor independent testing of turnouts for PFAS and PFAS-related hazards, (2) oppose the use of PFAS and PFAS-containing materials in turnouts, (3) require manufacturers to cease using PFAS in their firefighting products (4) identify

26  which manufacturers will not cease using PFAS, (5) issue an advisory to fire departments to stop sending used or old
   turnouts to communities that are not able to buy new gear and instead provide grants to purchase new gear, and (6) cease

27  accepting financial sponsorships from any PFAS/chemical-related companies unless it is to purchase PFAS-free turnout
   gear. Andrew Wallender, *PFAS Resolutions Overwhelmingly Approved by Firefighters' Union*, Bloomberg Law
   (February 1, 2021), https://news.bloomberglaw.com/daily-labor-report/pfas-resolutions-overwhelmingly-approved-by-

28  firefighters-union; San Francisco Firefighters Cancer Prevention Foundation, (last visited February 26, 2021),
   https://www.sffcpf.org/resolutions-to-protect-members-from-toxic-substances-in-ppe/.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1  regular sponsors of the IAFF Cancer Summit.

2       142.    At this event, as well as in firefighter cancer-related publications, programs and

3  events, Defendants repeatedly used the summit as an opportunity to push the narrative that

4  incidence of cancer among firefighters is attributable either to other chemicals encountered in

5  the line of duty, or firefighters' failure to wash their turnouts after every call. Not once have the

6  turnout Defendants admitted that the PFAS materials in their products has been found to be

7  carcinogenic, and that the very equipment that should be protecting firefighters are causing the

8  most harm. Further, Lion's recently launched "Not in Our House" cancer awareness program is

9  sadly ironic in that it encourages *firefighters to make a pledge* ("I will make every effort to

10 protect myself and my team by doing my part to take precautions that will minimize the risk of

11 exposure to carcinogens that may lead to cancer...") while refusing to take any responsibility

12 for continually exposing firefighters to carcinogens in their protective gear.[96]

13      143.    Firefighters, including CAPTAIN GOMES, deserved and deserve better. They are

14 the first to respond to emergencies faced by their community, and never hesitate to help. Whether

15 delivering a baby, responding to a fire, medical emergency, accident, mass shooting, terrorist

16 attack, natural disaster, or teaching kids about fire safety, firefighters always put the community

17 first. When a child is drowning in a pool or a family is caught in a burning house, they do not

18 stop to calculate whether they will benefit by doing the right thing. They are true public servants.

19 They step in and do what is needed when it is needed the most. Their health, safety and well-

20 being must be of the highest priority.

21      144.    Based on all of the foregoing, PLAINTIFFS, bring this action for damages and for

22 other appropriate relief sufficient to compensate them for the harm Defendants' PFAS chemicals

23 and PFAS-containing products have caused.

24 ///

25 **EQUITABLE TOLLING OF APPLICABLE STATUE OF LIMITATIONS**

26

27 [96] Rachel Zoch, *Take A Pledge To Stop Cancer At the Door*, Fire Rescue 1 (January 28, 2019),
28 https://www.firerescue1.com/fire-products/personal-protective-equipment-ppe/articles/take-a-pledge-to-stop-cancer-at-the-door-e8bn7uAbtlXWdQau/.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

41
COMPLAINT

145.    PLAINTIFFS incorporate by reference all prior paragraphs of this complaint as though fully set forth herein.

**A. Fraudulent Concealment**

146.    Defendants have known or should have known about the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS and PFAS-containing materials since at least the 1960s and as late as the early 1990s when study after study showed not only unacceptable levels of toxicity and bioaccumulation in human blood, but links to increased incidence of liver damage, various cancers and birth defects.

147.    Through no fault or lack of diligence, firefighters, including CAPTAIN GOMES, and PLAINTIFFS were deceived regarding the safety of turnouts and Class B foam and could not reasonably discover the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in turnouts and Class B foam, nor Defendants' deception with respect to the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in turnouts and Class B foam.

148.    PLAINTIFFS did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were concealing the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in turnouts and Class B foam. As alleged herein, the existence of hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in turnouts and Class B foam was material to PLAINTIFFS at all relevant times.

149.    Defendants did not fully disclose the seriousness of the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in turnouts and Class B foam, but instead ignored and/or concealed the defect from firefighters, including MR. GOMES, PLAINTIFFS, or the public, and refused to provide safe alternatives to PFAS or PFAS-containing materials in turnouts and Class B foam.

150.    At all times, Defendants are and were under a continuous duty to disclose to firefighters, including MR. GOMES, PLAINTIFFS, the public and their consumers, the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE 345
LOS ANGELES, CA 90049

1 | materials in turnouts and Class B foam.

2 |    151.    Defendants knowingly, actively, and affirmatively concealed the facts alleged

3 | herein. Firefighters, including MR. GOMES, and PLAINTIFFS reasonably relied on Defendants'

4 | knowing, active, and affirmative concealment.

5 |    152.    For these reasons, any and all applicable statutes of limitations have been tolled

6 | as a consequence of Defendants' ongoing knowledge, active concealment, and denial of the facts

7 | alleged herein.

8 |    **B. Estoppel**

9 |    153.    Defendants were and are under a continuous duty to disclose to their consumers,

10 | firefighters, including FIRE MARHSL HORTON, and PLAINTIFFS the hazardous toxicity,

11 | persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials

12 | in Class B foam and turnouts.

13 |    154.    Instead, Defendants actively concealed the hazardous toxicity, persistence, and

14 | bioaccumulation associated with the use of PFAS and PFAS-containing materials in Class B

15 | foam and turnouts; and knowingly made misrepresentations about the quality, reliability,

16 | characteristics, safety and performance of Class B foam and turnouts.

17 |    155.    Consumers, firefighters, including FIRE MARHSL HORTON, and PLAINTIFFS

18 | reasonably relied upon Defendants' knowing and affirmative misrepresentations, and/or active

19 | concealment, of these facts.

20 |    156.    Based on the foregoing, Defendants are estopped from relying on any and all

21 | applicable statutes of limitations in defense of this action.

22 |    **C. Discovery Rule**

23 |    157.    Firefighters, including CAPTAIN GOMES, had no ability to discern or suspect

24 | that the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS

25 | or PFAS-containing materials in Class B foam and turnouts were a substantial cause of their

26 | injuries.

27 |    158.    Accordingly, Defendants are precluded by the Discovery Rule and/or doctrine of

28 | fraudulent concealment, and/or the doctrine of estoppel from relying upon any and all applicable

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

43

1    statutes of limitations.

2    **FIRST CAUSE OF ACTION**

3    **STRICT LIABILITY - DESIGN DEFECT**

4    159.    The PLAINTIFFS assert the following cause of action against all Defendants,

5    including DOES 1-100.

6    160.    PLAINTIFFS incorporate by reference all prior paragraphs of this complaint, as

7    though fully set forth herein.

8    161.    Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or

9    entities they have acquired, have engaged in the business of designing, formulating,

10   manufacturing, labeling, marketing, promoting, advertising, distributing, supplying, and/or

11   selling of turnouts and/or Class B foam and through that conduct have knowingly placed PFAS-

12   containing products into the stream of commerce with full knowledge that they were sold to fire

13   departments or to companies that sold turnouts and/or Class B foam to fire departments for use

14   by firefighters such as CAPTAIN GOMES, who are exposed to PFAS through ordinary and

15   foreseeable uses for the purpose of firefighting activities and training.

16   162.    Defendants intended that the turnouts and/or Class B foam they were

17   manufacturing, selling, distributing, supplying, promoting, and or selling would be used by

18   firefighters, including CAPTAIN GOMES, without any substantial change in the condition of

19   the products from when they were initially manufactured, sold, distributed, and marketed by

20   Defendants. Turnouts and/or Class B foam were not safe for use by firefighters even when used

21   as directed by the manufacturer and for its intended purpose for firefighting activities which

22   include training, extinguishment, ventilation, search-and-rescue, salvage, containment, and

23   overhaul.

24   163.    Further, knowing of the dangerous and hazardous properties of turnouts and Class

25   B foam, Defendants could have manufactured, marketed, distributed, and sold alternative

26   designs or formulations of turnouts and/or Class B foam that did not contain PFAS. These

27   alternative designs and/or formulations were already available, practical, similar in cost, and

28   technologically feasible.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

164.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to firefighters, including CAPTAIN GOMES, that was caused by the Defendants' manufacture, marketing, and sale of turnouts and/or Class B foam containing PFAS and PFAS-containing materials.

165.    Additionally, the turnouts and/or Class B foam that were designed, manufactured, marketed, tested, advertised, marketed, promoted, sold, and distributed by the Defendants contained PFAS or PFAS-containing materials that were so toxic and unreasonably dangerous to human health and the environment, with the toxic chemicals being so mobile and persistent, that the act of designing, formulating, manufacturing, marketing, distributing, and selling these products was unreasonably dangerous under the circumstances.

166.    The turnouts and/or Class B foam designed, manufactured, marketed, tested, advertised, marketed, promoted, sold and distributed by the Defendants were dangerous and defective in design or formulation because, at the time in which the products left the hands of the manufacturer or distributors, the foreseeable risks exceeded the benefits associated with the design or formulation of turnouts and/or Class B foam.

167.    The turnouts and/or Class B foam designed, manufactured, marketed, tested, advertised, marketed, promoted, sold, and distributed by the Defendants were dangerous and defective in design or formulation because, when the PFAS-containing products left the hands of the manufacturer or distributors, said products were unreasonably dangerous, unreasonably dangerous in normal use, and were more dangerous than an ordinary consumer-firefighter would expect.

168.    The turnouts and/or Class B foam were in a defective condition and unsafe, and Defendants knew or had reason to know that these PFAS-containing products were defective and unsafe, especially when used in the form and manner as provided by Defendants. In particular, Defendants PFAS-containing products were defective in the following ways:

169.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam were defective in design and formulation and as a result failed to meet ordinary users' expectations as to their safety and failed to perform as an ordinary user would

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

45

expect.

170.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam were defective in design and formulation, and as a result, dangerous to an extent beyond which an ordinary consumer-firefighter would anticipate.

171.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

172.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

173.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam did not provide an adequate warning of the potential harm that could result from exposure to PFAS and/or emitted from the turnouts and/or Class B foam and, alternatively, did not have adequate instructions for safe use of the products.

174.    Exposure to PFAS presents a risk of grave and harmful side effects and injuries that outweigh any potential utility stemming from their use.

175.    Defendants knew or should have known at the time of manufacturing, selling, distributing, promoting or marketing their PFAS-containing turnouts and/or Class B foam that exposure to PFAS could result in cancer and other grave and serious illnesses and injuries as alleged herein.

176.    The foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

177.    CAPTAIN GOMES used these PFAS-containing products in the ways that Defendants intended them to be used.

178.    CAPTAIN GOMES used these PFAS-containing products in ways that were foreseeable to Defendants.

179.    CAPTAIN GOMES was exposed to PFAS by using Defendants' turnouts and/or Class B foam in the course of their employment, as described above, without knowledge of

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

46

1  turnouts' and/or Class B foam's dangerous propensities.

2      180.   The design defect in turnouts and/or Class B foam containing PFAS exposed

3  CAPTAIN GOMES, to toxic levels of PFAS and therefore, was a substantial factor in causing

4  his pre-death pain and suffering, following by his death and PLAINTIFFS' damages as described

5  herein.

6      181.   As a direct and proximate result of their improper and inadequate design and

7  formulation of turnouts and/or Class B foam containing PFAS, exposed CAPTAIN GOMES to

8  toxic levels of PFAS, which resulted in his cancer diagnosis and his ultimate death.

9      182.   As a direct and proximate result of their inadequate warnings and instructions, the

10  turnouts and/or Class B foam containing PFAS, exposed CAPTAIN GOMES to toxic levels of

11  PFAS, which resulted in his cancer diagnosis and his ultimate death.

12      183.   As a direct and proximate result of Defendants' intentional, malicious and

13  oppressive conduct, as well as their carelessness, negligence, gross negligence, their defective

14  products and their failure to warn of dangers associated with their defective turnouts and/or Class

15  B foam containing PFAS, CAPTAIN GOMES suffered painful death due to his battle with

16  cancer, as well as, fear, and emotional anguish throughout his cancer treatment until the time of

17  his death, causing his beneficiaries, including MRS. GOMES, CAMERON K. GOMES and

18  CARSON S. GOMES, to suffer devastating grief, injuries, emotional pain and suffering, as well

19  as economic damages, in an amount all to their general damages in excess of Twenty-Five

20  Thousand Dollars ($25,000.00) which will be stated according to proof, pursuant to California

21  Code of Civil Procedure Section 425.10.

22      184.   On October 1, 2021, Governor Newsom signed SB 447. SB 447 amended Code of

23  Civil Procedure §377.34 to allow decedents' predeath pain and suffering to be recovered in a

24  survival action under certain circumstances, including as is the case here, in actions filed on or

25  after January 1, 2022.

26      185.   As a direct and proximate result of Defendants' intentional, malicious and

27  oppressive conduct, as well as their carelessness, negligence, gross negligence, their defective

28  products and their failure to warn of dangers associated with their defective turnouts and/or Class

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

47

1  B foam containing PFAS, CAPTAIN GOMES suffered painful death due to his battle with

2  cancer, as well as, fear, and emotional anguish throughout his cancer treatment until the time of

3  his death, causing his beneficiaries, including MRS. GOMES, CAMERON K. GOMES and

4  CARSON S. GOMES, to suffer devastating grief, injuries, emotional pain and suffering,

5  including but not limited to the loss of comfort, society, guidance, companionship, support, love

6  and affection in an amount all to their general damages in excess of Twenty-Five Thousand

7  Dollars ($25,000.00) which will be stated according to proof, pursuant to California Code of

8  Civil Procedure Section 425.10.

9  **SECOND CAUSE OF ACTION**

10  **STRICT LIABILITY – FAILURE TO WARN**

11      186.   The PLAINTIFFS assert the following cause of action against all Defendants,

12  including DOES 1-100.

13      187.   PLAINTIFFS incorporate by reference all prior paragraphs of this complaint, as

14  though fully set forth herein.

15      188.   Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or

16  entities they have acquired, have engaged in the business of designing, formulating,

17  manufacturing, labeling, marketing, promoting, advertising, distributing, supplying, and/or

18  selling of turnouts and/or Class B foam containing PFAS or PFAS-containing materials and,

19  through that conduct, have knowingly placed PFAS-containing products into the stream of

20  commerce with full knowledge that they were sold to fire departments or to companies that sold

21  turnouts and/or Class B foam to fire departments for the use by firefighters such as CAPTAIN

22  GOMES, who was exposed to PFAS through ordinary and foreseeable uses for the purpose of

23  firefighting activities and training.

24      189.   The products complained of were designed, formulated, manufactured, marketed,

25  sold, supplied and/or distributed by each of the Defendants and used by and/or in the vicinity of

26  CAPTAIN GOMES during his lifetime and/or he was exposed to PFAS while using turnouts

27  and/or Class B foam in the ordinary course of performing his duties as a firefighter.

28      190.   Defendants expected that the PFAS-containing products they were manufacturing,

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

48
COMPLAINT

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1  selling, distributing, supplying, and/or promoting would reach firefighters, including CAPTAIN

2  GOMES, without any substantial change in the condition of the products from when they were

3  initially designed, formulated, manufactured, marketed, sold, supplied and/or distributed by

4  Defendants.

5      191.   Defendants knew or should have reasonably known that the manner in which they

6  were designing, formulating, manufacturing, marketing, selling, supplying and/or distributing

7  turnouts and/or Class B foam containing PFAS was hazardous to human health.

8      192.   The potential risks of using PFAS-containing products presented a substantial

9  danger to firefighters, including CAPTAIN GOMES, when the turnouts and/or Class B foam

10 were used or worn in an intended or reasonably foreseeable way.

11     193.   CAPTAIN GOMES used Class B foam and wore turnouts in the intended or

12 reasonably foreseeable way in the ordinary course of performing his duties as a firefighters,

13 including for fire suppression and fire suppression training.

14     194.   The turnouts and/or Class B foam manufactured, marketed, and sold by the

15 Defendants were dangerous and defective because the foreseeable risk of harm could have been

16 reduced or eliminated by the adoption of a reasonable, alternative design that was not

17 unreasonably dangerous.

18     195.   Defendants' products were in a defective condition and unreasonably dangerous,

19 in that turnouts and/or Class B foam which, by design, contain PFAS or PFAS-containing

20 products, are deleterious, toxic, and highly harmful to firefighters, including CAPTAIN

21 GOMES.

22     196.   Defendants knew or should have reasonably known that exposure to PFAS was

23 hazardous to human health, but:

24         a.   Did not provide an adequate warning of the potential harm that could result

25              from exposure to PFAS or PFAS-containing materials in turnouts and/or

26              Class B foam;

27         b.   Did not have adequate instructions for safe use of the products;

28         c.   Did not have warnings to persons, such as CAPTAIN GOMES, who had

                                          49
                                      COMPLAINT

been, or reasonably may have been, exposed to Defendants' turnouts and/or Class B foam, of their disease potential, the proper steps to take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations including the giving of histories which revealed the details of the previous exposure, and the need to have immediate and vigorous medical treatment for all related adverse health effects;

d. Did not manufacture, market, promote, distribute or sell reasonably comparable products not containing PFAS when it became feasible to design.

197. At the time of design, formulation, manufacture, marketing, promotion, sale, supply and/or distribution, Defendants could have provided warnings or instructions regarding the full and complete risks of turnouts and/or Class B foam containing PFAS or PFAS-containing materials, because Defendants knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

198. At all relevant time, Defendants' turnouts and/or Class B foam did not contain an adequate warning or caution statement, which was necessary.

199. CAPTAIN GOMES was unaware of the defective and unreasonable dangers of Defendants' products at a time when such products were being used for the purposes for which they were intended, and CAPTAIN GOMES was exposed to PFAS released from the Defendants' turnouts and/or Class B foam.

200. CAPTAIN GOMES did not and could not have known that the use of turnouts and/or Class B foam in the ordinary course of performing their duties as firefighters could be hazardous to their health, including but not limited to bio-accumulate in the blood, and cause serious health effects, including cancer.

201. Defendants knew that the use of turnouts and/or Class B foam, even when used as instructed by Defendants, subjected CAPTAIN GOMES and others to a substantial risk of harm and yet, failed to adequately warn firefighters, including CAPTAIN GOMES, the EPA, their consumers or the public.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA. 90049

50

COMPLAINT

202.    As a result of their inadequate warnings, Defendants' turnouts and/or Class B foam were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used or worn by firefighters, including by CAPTAIN GOMES.

203.    The lack of adequate and sufficient warnings was a substantial factor in causing the CAPTAIN GOMES's pre-death pain and suffering, followed by his death and PLAINTIFFS' damages as described herein.

204.    As a direct and proximate result of their improper and inadequate design and formulation of turnouts and/or Class B foam containing PFAS, exposed CAPTAIN GOMES to toxic levels of PFAS, which resulted in his cancer diagnosis and his ultimate death.

205.    As a direct and proximate result of their inadequate warnings and instructions, the turnouts and/or Class B foam containing PFAS, exposed CAPTAIN GOMES to toxic levels of PFAS, which resulted in his cancer diagnosis and his ultimate death.

206.    As a direct and proximate result of Defendants' intentional, malicious and oppressive conduct, as well as their carelessness, negligence, gross negligence, their defective products and their failure to warn of dangers associated with their defective turnouts and/or Class B foam containing PFAS, CAPTAIN GOMES suffered painful death due to his battle with cancer, as well as, fear, and emotional anguish throughout his cancer treatment until the time of his death, causing his beneficiaries, including MRS. GOMES, CAMERON K. GOMES and CARSON S. GOMES, to suffer devastating grief, injuries, emotional pain and suffering, as well as economic damages, in an amount all to their general damages in excess of Twenty-Five Thousand Dollars ($25,000.00) which will be stated according to proof, pursuant to California Code of Civil Procedure Section 425.10.

207.    On October 1, 2021, Governor Newsom signed SB 447. SB 447 amended Code of Civil Procedure §377.34 to allow decedents' predeath pain and suffering to be recovered in a survival action under certain circumstances, including as is the case here, in actions filed on or after January 1, 2022.

208.    As a direct and proximate result of Defendants' intentional, malicious and

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1  oppressive conduct, as well as their carelessness, negligence, gross negligence, their defective

2  products and their failure to warn of dangers associated with their defective turnouts and/or Class

3  B foam containing PFAS, CAPTAIN GOMES suffered painful death due to his battle with

4  cancer, as well as, fear, and emotional anguish throughout his cancer treatment until the time of

5  his death, causing his beneficiaries, including MRS. GOMES, CAMERON K. GOMES and

6  CARSON S. GOMES, to suffer devastating grief, injuries, emotional pain and suffering,

7  including but not limited to the loss of comfort, society, guidance, companionship, support, love

8  and affection in an amount all to their general damages in excess of Twenty-Five Thousand

9  Dollars ($25,000.00) which will be stated according to proof, pursuant to California Code of

10  Civil Procedure Section 425.10.

11                              **THIRD CAUSE OF ACTION**

12                                    **NEGLIGENCE**

13      209.  The PLAINTIFFS assert the following cause of action against all Defendants,

14  including DOES 1-100.

15      210.  PLAINTIFFS incorporate by reference all prior paragraphs of this complaint as

16  though fully set forth herein.

17      211.  Defendants owed a duty of care to their consumer, customers, including the

18  firefighters such as CAPTAIN GOMES, and PLAINTIFFS that were commensurate with the

19  inherently dangerous, harmful, injurious, bio-persistent, environmentally-persistent, toxic, and

20  bio-accumulative nature of Class B foam and turnouts containing PFAS or PFAS-containing

21  materials.

22      212.  Defendants had a duty to exercise reasonable care in the design, research, testing,

23  manufacture, marketing, formulation, supply, promotion, sale, labeling, training of users,

24  production of information materials, use and/or distribution of Class B foam and/or turnouts into

25  the stream of commerce, including a duty of care to ensure the PFAS did not infiltrate, persist

26  in, accumulate in the blood and/or bodies of the firefighters, including CAPTAIN GOMES, and

27  including a duty to assure their products would not cause users to suffer unreasonable, dangerous

28  side effects.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

213.   Defendants had a duty to exercise reasonable care to ensure that Class B foam and/or turnouts were manufactured, marketed, and sold in such a way as to ensure that the end users of Class B foam and/or turnouts were aware of the potential harm PFAS can cause to human health, and were advised to use it in such a way that would not be hazardous to their health.

214.   Defendants had a duty to warn of the hazards associated with PFAS and PFAS-containing materials and were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about the Class B foam and/or turnouts. However, Defendants knowingly and intentionally failed to do so.

215.   Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, formulating, marketing, testing, promotion, supply, sale, and/or distribution of their PFAS chemicals and PFAS-containing products in the regular course of business, in that Defendants knew or should have known that use and exposure to PFAS and PFAS-containing materials was hazardous to human health and created a high risk of unreasonable, dangerous side effects, including but not limited to severe personal injuries, as described herein.

216.   Defendants also knew or should have known that the manner in which they were designing, formulating, manufacturing, marketing, promoting, distributing, and/or selling Class B foam and/or turnouts containing PFAS or PFAS-containing materials was hazardous to human health, bio-accumulated in the blood, and caused serious health effects, including cancer.

217.   Defendants negligently and deceptively underreported, underestimated, downplayed the serious health dangers of the Class B foam and/or turnouts products.

218.   Defendants negligently, carelessly and recklessly recommended application and disposal techniques for PFAS and/or for products containing PFAS that directly and proximately caused harm to CAPTAIN GOMES and PLAINTIFFS.

219.   Defendants knew or should have known that firefighters working with and using Class B foam and/or turnouts products would be exposed to PFAS.

220.   At all times material, CAPTAIN GOMES inhaled, ingested and/or absorbed dermally hazardous PFAS contaminants released from the Defendants' Class B foam and/or

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

53

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1   turnouts.

2       221.    CAPTAIN GOMES's exposure to Defendant's Class B foam and/or turnouts,

3   which were connected to and incidental to Defendants' manufacture, design, sale, supply and/or

4   distribution of its PFAS-containing products, was harmful and substantially increased the risk

5   of injuries to CAPTAIN GOMES, and did cause injuries to CAPTAIN GOMES, including his

6   ultimate death.

7       222.    Defendants knew or should have known that the manner in which they were

8   manufacturing, marketing, distributing and selling Class B foam and/or turnouts containing

9   PFAS or PFAS-containing materials would result in harm to firefighters, including to CAPTAIN

10  GOMES, as a result of using Class B foam and/or turnouts in the ordinary course of performing

11  their duties as firefighters.

12      223.    Defendants knew, foresaw, anticipated, and/or should have foreseen, anticipated,

13  and/or known that the design, engineering, manufacture, fabrication, sale, release, handling, use,

14  and/or distribution of PFAS or PFAS-containing materials in Class B foam and turnouts, and/or

15  Defendants' other acts and/or omissions as described in this complaint, could likely result in

16  PFAS exposure to firefighters, including to CAPTAIN GOMES, the persistence and

17  accumulation of toxic and harmful PFAS in their blood and/or bodies, and cause injuries to

18  firefighters, including to CAPTAIN GOMES, as herein alleged.

19      224.    Despite knowing, anticipating, and/or foreseeing the bio-persistent, bio-

20  accumulative, toxic, and/or otherwise harmful and/or injurious nature of PFAS materials,

21  Defendants, their agents, servants, and/or employees, committed negligent acts and/or omissions

22  that resulted in PFAS exposure to firefighters, including CAPTAIN GOMES.

23      225.    Defendants, through their acts and/or omissions as described in this complaint,

24  breached their duties to CAPTAIN GOMES.

25      226.    It was reasonably foreseeable to Defendants that firefighters, including CAPTAIN

26  GOMES would likely suffer the injuries and harm described in this complaint by virtue of

27  Defendants' breach of their duty and failure to exercise ordinary care, as described herein.

28      227.    As a direct and proximate result of their foregoing acts, omissions and negligence,

1  CAPTAIN GOMES was exposed to toxic levels of PFAS, which resulted in his cancer diagnosis
2  and his ultimate death.

3      228.   As a direct and proximate result of their foregoing acts, omissions and negligence
4  and inadequate warnings and instructions, the turnouts and/or Class B foam containing PFAS,
5  exposed CAPTAIN GOMES to toxic levels of PFAS, which resulted in his cancer diagnosis and
6  his ultimate death.

7      229.   As a direct and proximate result of Defendants' negligence, their defective
8  products and their failure to warn of dangers associated with their defective turnouts and/or Class
9  B foam containing PFAS, CAPTAIN GOMES suffered painful death due to his battle with
10  cancer, as well as, fear, and emotional anguish throughout his cancer treatment until the time of
11  his death, causing his beneficiaries, including MRS. GOMES, CAMERON K. GOMES and
12  CARSON S. GOMES, to suffer devastating grief, injuries, emotional pain and suffering, as well
13  as economic damages, in an amount all to their general damages in excess of Twenty-Five
14  Thousand Dollars ($25,000.00) which will be stated according to proof, pursuant to California
15  Code of Civil Procedure Section 425.10.

16      230.   On October 1, 2021, Governor Newsom signed SB 447. SB 447 amended Code of
17  Civil Procedure §377.34 to allow decedents' predeath pain and suffering to be recovered in a
18  survival action under certain circumstances, including as is the case here, in actions filed on or
19  after January 1, 2022.

20      231.   As a direct and proximate result of Defendants' negligence, their defective
21  products and their failure to warn of dangers associated with their defective turnouts and/or Class
22  B foam containing PFAS, CAPTAIN GOMES suffered painful death due to his battle with
23  cancer, as well as, fear, and emotional anguish throughout his cancer treatment until the time of
24  his death, causing his beneficiaries, including MRS. GOMES, CAMERON K. GOMES and
25  CARSON S. GOMES, to suffer devastating grief, injuries, emotional pain and suffering,
26  including but not limited to the loss of comfort, society, guidance, companionship, support, love
27  and affection in an amount all to their general damages in excess of Twenty-Five Thousand
28  Dollars ($25,000.00) which will be stated according to proof, pursuant to California Code of

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA. 90049

COMPLAINT

1    Civil Procedure Section 425.10.

2                    **FOURTH CAUSE OF ACTION**

3                        **WRONGFUL DEATH**

4        232.    The PLAINTIFFS assert the following cause of action against all Defendants,

5    including DOES 1-100.

6        233.    PLAINTIFFS incorporate by reference all prior paragraphs of this complaint, as

7    though fully set forth herein.

8        234.    Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or

9    entities they have acquired, have engaged in the business of designing, formulating,

10   manufacturing, labeling, marketing, promoting, advertising, distributing, supplying, and/or

11   selling of turnouts and/or Class B foam containing PFAS or PFAS-containing materials and,

12   through that conduct, have knowingly placed PFAS-containing products into the stream of

13   commerce with full knowledge that they were sold to fire departments or to companies that sold

14   turnouts and/or Class B foam to fire departments for the use by firefighters such as CAPTAIN

15   GOMES, who was exposed to PFAS through ordinary and foreseeable uses for the purpose of

16   firefighting activities and training.

17       235.    The products complained of were designed, formulated, manufactured, marketed,

18   sold, supplied and/or distributed by each of the Defendants and used by and/or in the vicinity of

19   CAPTAIN GOMES during his lifetime and/or he was exposed to PFAS while using turnouts

20   and/or Class B foam in the ordinary course of performing his duties as a firefighter.

21       236.    Defendants expected that the PFAS-containing products they were manufacturing,

22   selling, distributing, supplying, and/or promoting would reach firefighters, including CAPTAIN

23   GOMES, without any substantial change in the condition of the products from when they were

24   initially designed, formulated, manufactured, marketed, sold, supplied and/or distributed by

25   Defendants.

26       237.    Defendants knew or should have reasonably known that the manner in which they

27   were designing, formulating, manufacturing, marketing, selling, supplying and/or distributing

28   turnouts and/or Class B foam containing PFAS was hazardous to human health.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

238.    The potential risks of using PFAS-containing products presented a substantial danger to firefighters, including CAPTAIN GOMES, when the turnouts and/or Class B foam were used or worn in an intended or reasonably foreseeable way.

239.    CAPTAIN GOMES used Class B foam and wore turnouts in the intended or reasonably foreseeable way in the ordinary course of performing his duties as a firefighters, including for fire suppression and fire suppression training.

240.    The turnouts and/or Class B foam manufactured, marketed, and sold by the Defendants were dangerous and defective because the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

241.    Defendants' products were in a defective condition and unreasonably dangerous, in that turnouts and/or Class B foam which, by design, contain PFAS or PFAS-containing products, are deleterious, toxic, and highly harmful to firefighters, including CAPTAIN GOMES.

242.    Defendants knew or should have reasonably known that exposure to PFAS was hazardous to human health, but:

    a.    Did not provide an adequate warning of the potential harm that could result from exposure to PFAS or PFAS-containing materials in turnouts and/or Class B foam;

    b.    Did not have adequate instructions for safe use of the products;

    c.    Did not have warnings to persons, such as CAPTAIN GOMES, who had been, or reasonably may have been, exposed to Defendants' turnouts and/or Class B foam, of their disease potential, the proper steps to take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations including the giving of histories which revealed the details of the previous exposure, and the need to have immediate and vigorous medical treatment for all related adverse health effects;

    d.    Did not manufacture, market, promote, distribute or sell reasonably

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1    comparable products not containing PFAS when it became feasible to

2    design.

3    243. At the time of design, formulation, manufacture, marketing, promotion, sale,

4    supply and/or distribution, Defendants could have provided warnings or instructions regarding

5    the full and complete risks of turnouts and/or Class B foam containing PFAS or PFAS-containing

6    materials, because Defendants knew or should have known of the unreasonable risks of harm

7    associated with the use of and/or exposure to such products.

8    244. At all relevant time, Defendants' turnouts and/or Class B foam did not contain an

9    adequate warning or caution statement, which was necessary.

10    245. CAPTAIN GOMES was unaware of the defective and unreasonable dangers of

11    Defendants' products at a time when such products were being used for the purposes for which

12    they were intended, and CAPTAIN GOMES was exposed to PFAS released from the

13    Defendants' turnouts and/or Class B foam.

14    246. CAPTAIN GOMES did not and could not have known that the use of turnouts

15    and/or Class B foam in the ordinary course of performing their duties as firefighters could be

16    hazardous to their health, including but not limited to bio-accumulate in the blood, and cause

17    serious health effects, including cancer.

18    247. Defendants knew that the use of turnouts and/or Class B foam, even when used as

19    instructed by Defendants, subjected CAPTAIN GOMES and others to a substantial risk of harm

20    and yet, failed to adequately warn firefighters, including CAPTAIN GOMES, the EPA, their

21    consumers or the public.

22    248. As a result of their inadequate warnings, Defendants' turnouts and/or Class B

23    foam were defective and unreasonably dangerous when they left the possession and/or control

24    of Defendants, were distributed by Defendants, and used or worn by firefighters, including by

25    CAPTAIN GOMES.

26    249. The lack of adequate and sufficient warnings was a substantial factor in causing

27    the CAPTAIN GOMES's pre-death pain and suffering, followed by his death and PLAINTIFFS'

28    damages as described herein.

BALABAN & SPIELBERGER LLP
11859 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA. 90049

250. As a direct and proximate result of their improper and inadequate design and formulation of turnouts and/or Class B foam containing PFAS, exposed CAPTAIN GOMES to toxic levels of PFAS, which resulted in his cancer diagnosis and his ultimate death.

251. As a direct and proximate result of their inadequate warnings and instructions, the turnouts and/or Class B foam containing PFAS, exposed CAPTAIN GOMES to toxic levels of PFAS, which resulted in his cancer diagnosis and his ultimate death.

252. As a direct and proximate result of Defendants' intentional, malicious and oppressive conduct, as well as their carelessness, negligence, gross negligence, their defective products and their failure to warn of dangers associated with their defective turnouts and/or Class B foam containing PFAS, CAPTAIN GOMES suffered painful death due to his battle with cancer, as well as, fear, and emotional anguish throughout his cancer treatment until the time of his death, causing his beneficiaries, including MRS. GOMES, CAMERON K. GOMES and CARSON S. GOMES, to suffer devastating grief, injuries, emotional pain and suffering, as well as economic damages, in an amount all to their general damages in excess of Twenty-Five Thousand Dollars ($25,000.00) which will be stated according to proof, pursuant to California Code of Civil Procedure Section 425.10.

253. On October 1, 2021, Governor Newsom signed SB 447. SB 447 amended Code of Civil Procedure §377.34 to allow decedents' predeath pain and suffering to be recovered in a survival action under certain circumstances, including as is the case here, in actions filed on or after January 1, 2022.

254. As a direct and proximate result of Defendants' intentional, malicious and oppressive conduct, as well as their carelessness, negligence, gross negligence, their defective products and their failure to warn of dangers associated with their defective turnouts and/or Class B foam containing PFAS, CAPTAIN GOMES suffered painful death due to his battle with cancer, as well as, fear, and emotional anguish throughout his cancer treatment until the time of his death, causing his beneficiaries, including MRS. GOMES, CAMERON K. GOMES and CARSON S. GOMES, to suffer devastating grief, injuries, emotional pain and suffering, including but not limited to the loss of comfort, society, guidance, companionship, support, love

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1   and affection in an amount all to their general damages in excess of Twenty-Five Thousand

2   Dollars ($25,000.00) which will be stated according to proof, pursuant to California Code of

3   Civil Procedure Section 425.10.

### FIFHT CAUSE OF ACTION

### SURVIVAL ACTION

6   255.   The PLAINTIFFS assert the following cause of action against all Defendants,

7   including DOES 1-100.

8   256.   PLAINTIFFS incorporate by reference all prior paragraphs of this complaint, as

9   though fully set forth herein.

10   257.   Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or

11   entities they have acquired, have engaged in the business of designing, formulating,

12   manufacturing, labeling, marketing, promoting, advertising, distributing, supplying, and/or

13   selling of turnouts and/or Class B foam containing PFAS or PFAS-containing materials and,

14   through that conduct, have knowingly placed PFAS-containing products into the stream of

15   commerce with full knowledge that they were sold to fire departments or to companies that sold

16   turnouts and/or Class B foam to fire departments for the use by firefighters such as CAPTAIN

17   GOMES, who was exposed to PFAS through ordinary and foreseeable uses for the purpose of

18   firefighting activities and training.

19   258.   The products complained of were designed, formulated, manufactured, marketed,

20   sold, supplied and/or distributed by each of the Defendants and used by and/or in the vicinity of

21   CAPTAIN GOMES during his lifetime and/or he was exposed to PFAS while using turnouts

22   and/or Class B foam in the ordinary course of performing his duties as a firefighter.

23   259.   Defendants expected that the PFAS-containing products they were manufacturing,

24   selling, distributing, supplying, and/or promoting would reach firefighters, including CAPTAIN

25   GOMES, without any substantial change in the condition of the products from when they were

26   initially designed, formulated, manufactured, marketed, sold, supplied and/or distributed by

27   Defendants.

28   260.   Defendants knew or should have reasonably known that the manner in which they

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

60

were designing, formulating, manufacturing, marketing, selling, supplying and/or distributing turnouts and/or Class B foam containing PFAS was hazardous to human health.

261.    The potential risks of using PFAS-containing products presented a substantial danger to firefighters, including CAPTAIN GOMES, when the turnouts and/or Class B foam were used or worn in an intended or reasonably foreseeable way.

262.    CAPTAIN GOMES used Class B foam and wore turnouts in the intended or reasonably foreseeable way in the ordinary course of performing his duties as a firefighters, including for fire suppression and fire suppression training.

263.    The turnouts and/or Class B foam manufactured, marketed, and sold by the Defendants were dangerous and defective because the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

264.    Defendants' products were in a defective condition and unreasonably dangerous, in that turnouts and/or Class B foam which, by design, contain PFAS or PFAS-containing products, are deleterious, toxic, and highly harmful to firefighters, including CAPTAIN GOMES.

265.    Defendants knew or should have reasonably known that exposure to PFAS was hazardous to human health, but:

    a.  Did not provide an adequate warning of the potential harm that could result from exposure to PFAS or PFAS-containing materials in turnouts and/or Class B foam;

    b.  Did not have adequate instructions for safe use of the products;

    c.  Did not have warnings to persons, such as CAPTAIN GOMES, who had been, or reasonably may have been, exposed to Defendants' turnouts and/or Class B foam, of their disease potential, the proper steps to take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations including the giving of histories which revealed the details of the previous exposure, and the need to have immediate and vigorous

COMPLAINT

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1    medical treatment for all related adverse health effects;

2    d. Did not manufacture, market, promote, distribute or sell reasonably

3    comparable products not containing PFAS when it became feasible to

4    design.

5    266.    At the time of design, formulation, manufacture, marketing, promotion, sale,

6    supply and/or distribution, Defendants could have provided warnings or instructions regarding

7    the full and complete risks of turnouts and/or Class B foam containing PFAS or PFAS-containing

8    materials, because Defendants knew or should have known of the unreasonable risks of harm

9    associated with the use of and/or exposure to such products.

10    267.    At all relevant time, Defendants' turnouts and/or Class B foam did not contain an

11    adequate warning or caution statement, which was necessary.

12    268.    CAPTAIN GOMES was unaware of the defective and unreasonable dangers of

13    Defendants' products at a time when such products were being used for the purposes for which

14    they were intended, and CAPTAIN GOMES was exposed to PFAS released from the

15    Defendants' turnouts and/or Class B foam.

16    269.    CAPTAIN GOMES did not and could not have known that the use of turnouts

17    and/or Class B foam in the ordinary course of performing their duties as firefighters could be

18    hazardous to their health, including but not limited to bio-accumulate in the blood, and cause

19    serious health effects, including cancer.

20    270.    Defendants knew that the use of turnouts and/or Class B foam, even when used as

21    instructed by Defendants, subjected CAPTAIN GOMES and others to a substantial risk of harm

22    and yet, failed to adequately warn firefighters, including CAPTAIN GOMES, the EPA, their

23    consumers or the public.

24    271.    As a result of their inadequate warnings, Defendants' turnouts and/or Class B

25    foam were defective and unreasonably dangerous when they left the possession and/or control

26    of Defendants, were distributed by Defendants, and used or worn by firefighters, including by

27    CAPTAIN GOMES.

28    272.    The lack of adequate and sufficient warnings was a substantial factor in causing

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

1  the CAPTAIN GOMES's pre-death pain and suffering, followed by his death and PLAINTIFFS'

2  damages as described herein.

3    273.    As a direct and proximate result of their improper and inadequate design and

4  formulation of turnouts and/or Class B foam containing PFAS, exposed CAPTAIN GOMES to

5  toxic levels of PFAS, which resulted in his cancer diagnosis and his ultimate death.

6    274.    As a direct and proximate result of their inadequate warnings and instructions, the

7  turnouts and/or Class B foam containing PFAS, exposed CAPTAIN GOMES to toxic levels of

8  PFAS, which resulted in his cancer diagnosis and his ultimate death.

9    275.    As a direct and proximate result of Defendants' intentional, malicious and

10  oppressive conduct, as well as their carelessness, negligence, gross negligence, their defective

11  products and their failure to warn of dangers associated with their defective turnouts and/or Class

12  B foam containing PFAS, CAPTAIN GOMES suffered painful death due to his battle with

13  cancer, as well as, fear, and emotional anguish throughout his cancer treatment until the time of

14  his death, causing his beneficiaries, including MRS. GOMES, CAMERON K. GOMES and

15  CARSON S. GOMES, to suffer devastating grief, injuries, emotional pain and suffering, as well

16  as economic damages, in an amount all to their general damages in excess of Twenty-Five

17  Thousand Dollars ($25,000.00) which will be stated according to proof, pursuant to California

18  Code of Civil Procedure Section 425.10.

19    276.    On October 1, 2021, Governor Newsom signed SB 447. SB 447 amended Code of

20  Civil Procedure §377.34 to allow decedents' predeath pain and suffering to be recovered in a

21  survival action under certain circumstances, including as is the case here, in actions filed on or

22  after January 1, 2022.

23    277.    As CAPTAIN GOMES's SURVIVORS seeks all damages permitted under survival

24  claims, including, but not limited to those set forth in California Code of Civil Procedure § 377.10,

25  et seq. SURVIVORS succeeds to all damages related to those causes of action, as well as any other

26  claims as the SURVIVORS may have as MR. GOMES's successors.

27    278.    As a direct and proximate result of Defendants' intentional, malicious and

28  oppressive conduct, as well as their carelessness, negligence, gross negligence, their defective

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA  90049

products and their failure to warn of dangers associated with their defective turnouts and/or Class B foam containing PFAS, CAPTAIN GOMES suffered painful death due to his battle with cancer, as well as, fear, and emotional anguish throughout his cancer treatment until the time of his death, causing his beneficiaries, including MRS. GOMES, CAMERON K. GOMES and CARSON S. GOMES, to suffer devastating grief, injuries, emotional pain and suffering, including but not limited to the loss of comfort, society, guidance, companionship, support, love and affection in an amount all to their general damages in excess of Twenty-Five Thousand Dollars ($25,000.00) which will be stated according to proof, pursuant to California Code of Civil Procedure Section 425.10.

**SIXTH CAUSE OF ACTION**

**LOSS OF CONSORTIUM**

279.    The PLAINTIFFS assert the following cause of action against all Defendants, including DOES 1-100.

280.    This cause of action is asserted against all Defendants on behalf of Plaintiff ESTHER GOMES, (hereinafter "MRS. GOMES" as previously defined).

281.    Plaintiff MRS. GOMES incorporates by reference all prior paragraphs of this complaint, as though fully set forth herein.

282.    MRS. GOMES and CAPTAIN GOMES were lawfully married for 30 years, up to the time of CAPTAIN GOMES's death.

283.    As alleged above, and as a result of the Defendants' conduct, CAPTAIN GOMES suffered during his battle with cancer, pre-death pain and suffering and ultimately died from cancer.

284.    As a proximate result of her husbands' injuries sustained from the exposure and use of Class B foam and/or turnouts in the ordinary course of performing his firefighting duties, MRS. GOMES was deprived of love, companionship, comfort, care, assistance, protection, affection, society, moral support, sexual relations and conjugal fellowship, during her husbands' illnesses, and treatment, and since his death, which deprivation has caused, continues to cause, and in the future is expected to cause MRS. GOMES emotional distress, loss of consortium,

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

love, society, comfort and affection, and has thereby sustained pecuniary losses, which losses will be stated according to proof at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFFS respectfully pray this Court for the following relief:

1. For special damages according to proof;

2. For general damages according to proof;

3. For punitive damages on behalf of the successor in interest to the GOMES ESTATE.

4. For prejudgment interest, according to proof;

5. For costs of suit incurred herein; and

6. For such other and further relief as the court may deem just and proper.

DATED: November 14, 2024        BALABAN & SPIELBERGER, LLP

By:  _____
Daniel K. Balaban
Andrew J. Spielberger
Kahren Harutyunyan
Attorneys for PLAINTIFFS

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE 345
LOS ANGELES, CA 90049

## DEMAND FOR JURY TRIAL

PLAINTIFFS hereby demands a jury trial for each cause of action for which they are entitled a jury trial.

DATED:  November 14, 2024                BALABAN & SPIELBERGER, LLP

By: _____
                                          Daniel K. Balaban
                                          Andrew J. Spielberger
                                          Kahren Harutyunyan
                                          Attorneys for PLAINTIFFS

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD., STE. 345
LOS ANGELES, CA 90049

66
COMPLAINT